[No. 55232–1. En Banc. September 28, 1989.]

LEADER NATIONAL INSURANCE COMPANY, *Respondent,* v. ROSANNA V. TORRES, ET AL, *Petitioners.*

*Horton, Wilkins & Faurholt,* by *Harvey Faurholt,* for petitioners.

*Weeks & Skala,* by *Mark A. Kunkler, Roland L. Skala,* and *James D. Maloney III,* for respondent.

*Gary N. Bloom, Bryan P. Harnetiaux,* and *Daniel Huntington* on behalf of Washington State Trial Lawyers Association, amici curiae for petitioners.

*William C. Smart* and *Leonard B. Barson* on behalf of Subrogation Insurers Amicus Group, amici curiae for respondent.

DOLLIVER, J.—On September 4, 1984, the insured, Mark G. Maier, was injured when his vehicle collided with a vehicle driven by defendant Rosanna Torres and owned by defendant Olivia Torres. Shortly after the accident, Maier had his gallbladder removed. It remains disputed whether the surgery was a result of the accident. Maier received for medical expenses the $10,000 policy limit under his personal injury protection (PIP) coverage from plaintiff Leader National Insurance Co. (Leader), his insurer. Maier commenced an action in Franklin County Superior Court against the Torreses for unreimbursed medical expenses of $5,211.10, for wage loss, and for general damages. Leader's motion to amend Maier's original complaint to include Leader's claim for $10,000 in PIP payments was denied.

In December 1985, the Torreses offered to pay Maier $10,000 in full and complete settlement of all Maier's claims against them. During the negotiation, Leader's attorney objected to any release which would prejudice Leader's subrogation rights. On December 23, a reasonableness hearing was held at which attorneys for Maier, Leader, and the Torreses were present. The trial court approved a settlement and general release whereby Maier would receive $10,000 for release of the Torreses, their insurer, and their attorneys from "any and all claims". There is no allegation the Torreses' assets were depleted at the time of the settlement.

Leader then commenced an action in Franklin County Superior Court against the Torreses to recover the $10,000 it had paid to Maier under the PIP coverage. On December 22, 1986, the trial court granted the Torreses' motion for summary judgment holding the release destroyed Leader's subrogation rights and limiting Leader's remedy to recovery from its insured. Leader appealed; the Court of Appeals reversed in a published decision which held a release between an insured and a tortfeasor does not extinguish the insurer's subrogation rights if (1) the tortfeasor knows of the insurer's payment and right of subrogation, (2) the

insurer does not consent to the settlement, and (3) the settlement does not exhaust the tortfeasor's assets. *Leader Nat'l Ins. Co. v. Torres,* 51 Wn. App. 136, 751 P.2d 1252 (1988). The Torreses' petition for review was granted by this court. After oral argument was heard, additional briefing was requested on the effect of the reasonableness hearing procedure in RCW 4.22 on the resolution of the issue. We affirm.

The issue is whether an insurer's equitable right of subrogation is destroyed by a general release executed between its insured and the tortfeasor. This question has not been directly addressed in Washington. Generally, subrogation is an equitable doctrine and resolution of each case should be based upon "the equitable factors involved, guided by the principle that a party suffering compensable injury is entitled to be made whole but should not be allowed to duplicate his recovery." *Thiringer v. American Motors Ins. Co.,* 91 Wn.2d 215, 220, 588 P.2d 191 (1978).

In *General Ins. Co. of Am. v. Stoddard Wendle Ford Motors,* 67 Wn.2d 973, 410 P.2d 904 (1966), this issue was raised but not decided because the defendant was a beneficiary to the insurance contract rather than a third party tortfeasor. In dicta, however, we stated we would "have serious doubts" whether the release would extinguish an insurer's equitable subrogation right. *Stoddard,* at 977. At that time, we noted the "substantial body of law developing which indicates that a settlement by a tort–feasor and the insured, with an accompanying release made with the knowledge of the tort–feasor that the insurer has paid that portion of the loss for which it was liable, does not defeat the insurer's claim to subrogation against the tort–feasor." *Stoddard,* at 976–77.

The overwhelming majority of states allows a subsequent equitable subrogation action by an insurer if the insurer did not consent to the release and the tortfeasor knew of the insurer's interest prior to the release. *See generally Leader Nat'l Ins. Co. v. Torres, supra* at 141–42 n.2; *see also* 44 Am. Jur. 2d *Insurance* § 1811 (Supp. 1989). The Court of

Appeals has supported this position in other contexts. *See Newcomer v. Masini,* 45 Wn. App. 284, 724 P.2d 1122 (1986); *Lizotte v. Lizotte,* 15 Wn. App. 622, 551 P.2d 137 (1976). Relying in part on *Stoddard, Lizotte* held the release of a child support obligation between two spouses did not destroy the State's subrogation right against the obligated spouse when the State did not consent to the release and the spouse knew of the State's subrogation right. *Lizotte,* at 628–29. Similarly, in *Masini,* the court held a release negotiated between the injured party and the defendant, which released both the defendant and a third party defendant, did not destroy the subrogation rights of the defendant against the third party defendant. The court stated that absent language in the release as to subrogation rights, these rights survive the release to allow one who has "paid the debt . . . the opportunity to reclaim those moneys paid from the party who unjustly benefited from the payment". *Masini,* at 290.

In cases involving insurers' reimbursement from their own insureds, the implications we have given as to whether we would adhere to the majority rule have been conflicting. *See Thiringer v. American Motors Ins. Co., supra* at 220–21; *Metropolitan Life Ins. Co. v. Ritz,* 70 Wn.2d 317, 422 P.2d 780 (1967). *See also Elovich v. Nationwide Ins. Co.,* 104 Wn.2d 543, 555, 707 P.2d 1319 (1985); *State Farm Mut. Auto. Ins. Co. v. Lou,* 36 Wn. App. 838, 678 P.2d 339 (1984). However, because these cases focus upon insurers' rights of reimbursement from their insureds, they do not squarely address the equities involved in an insurer's equitable subrogation claim against a tortfeasor. We now address those equities and confirm our adherence to the majority rule.

The equitable factors involved in these situations include the knowledge of insureds and tortfeasors as to outstanding subrogation claims, the extent of the prejudice to insurers' subrogation interests, the desirability of encouraging settlements, the possibility of sharp practices by tortfeasors, insureds or their insurance carriers, and the general public

policy that persons suffering compensable injuries are entitled to be made whole.

In a situation where both the insured and the tortfeasor execute a general release with knowledge of the insurer's equitable subrogation rights and without the consent of the insurer, equity does not favor placing the loss entirely on either party. Both are equally at fault in ignoring the legitimate subrogation interests of the insurer. However, if the settlement depletes the tortfeasor's assets, both present and prospective, equity should validate the release as the insurer has not been prejudiced thereby and the parties to the release have not acted in derogation of the insurer's rights. *See Thiringer,* at 220–21.

While validating the release and destroying the insurer's subrogation rights might encourage settlement and avoid litigation between tortfeasors and insureds, such a speculative result is not equitably purchased at the price of either abandoning the subrogation rights of the insurer or limiting recovery to reimbursement from the injured insured. Releases executed without consent from subrogors and with knowledge of outstanding subrogation claims should not be enforced in equity to destroy the rights of subrogors. With the prospect of litigation, either with the insured or the insurer, squarely facing the tortfeasor, it is not at all certain that settlements would be impeded.

We concur with the reasoning of the Illinois Supreme Court that allowing a general release between the tortfeasor and the insured may "constitut[e] a trap for the unwary insured plaintiff" and "encourag[e] . . . sharp practice on the part of the tortfeasor or his insurance carrier." *Leader,* at 140 (quoting *Home Ins. Co. v. Hertz Corp.,* 71 Ill. 2d 210, 214, 375 N.E.2d 115 (1978)). However, if the general release is held not to destroy subsequent subrogation actions, an unsophisticated injured insured may sign a general release believing the subrogation claim is thereby extinguished. Although sympathy may lie with the injured party, equity does not favor either party when considering the possibility of sharp practices.

The equities involved in this case are closely balanced. Both the tortfeasor and the insured executed a release with knowledge of the insurer's subrogation rights and without the insurer's consent. There is no evidence in this case that the tortfeasor's assets were depleted by the settlement, and it is speculation whether the result of this case will affect the number and desirability of settlements in the future. In addition, either party could be subject to sharp practices depending upon whether subsequent subrogation actions are allowed or disallowed.

Where the equities are evenly balanced, the principle that persons suffering compensable injury are entitled to be made whole without duplicating their recovery becomes determinative. *See Thiringer v. American Motors Ins. Co., supra.* Thus, equity requires the risk of loss be borne by the tortfeasor, rather than by the injured insured. The tortfeasor then has the option of either settling with the insurer or litigating the dispute. If a settlement is pursued, the loss will be apportioned accordingly. If a trial ensues, the loss will be borne by the tortfeasor, if at fault, or if not at fault, the loss will fall to the insurer, a risk it took in exchange for premiums paid. In this case, litigation would determine if the insured's gallbladder surgery was proximately caused by the accident.

If a subsequent trial is conducted, inquiry need not be made into whether the injured insured was fully compensated by the settlement. Such an inquiry is relevant if the insurer chooses to seek reimbursement from its insured. *See Elovich,* at 555; *Thiringer,* at 219; *Jones v. Firemen's Relief & Pension Bd.,* 48 Wn. App. 262, 738 P.2d 1068 (1987). In *Thiringer,* we stated:

> The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tort–feasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss.

> This rule embodies a policy deemed socially desirable in this state, in that it fosters the adequate indemnification of innocent automobile accident victims.

(Citations omitted.) *Thiringer,* at 219–20. If the insurer chooses to seek reimbursement from its insured, because adoption of the majority rule would not allow the subrogation rights of the insurer to be prejudiced, the right of reimbursement would arise only after the insured was fully compensated. *See Thiringer,* at 219; *State Farm Mut. Auto. Ins. Co. v. Lou, supra* at 841. In a subsequent subrogation action against the tortfeasor, however, the compensation received by the injured insured is unaffected. The settlement between the insured and the tortfeasor was a compromise and represents what the case was worth to the insured without having to endure a trial. Such a determination need not subsequently be made by the courts in an insurer's subrogation action against the tortfeasor.

We reject defendant's argument that the statutory reasonableness hearing provided for in RCW 4.22.060 is the proper forum for insurance disputes and that the determination made at the hearing should not be subject to further court proceedings. The statutory scheme adopted by RCW 4.22.030–.060 contemplated the settlement of filed lawsuits involving joint tortfeasors. *See* Laws of 1981, ch. 27, § 1, p. 112 (Preamble); *see also* Senate Journal, 47th Legislature (1981), at 636–37. The tort reform act and the cases construing it have not extended protection to insurers. *Elovich v. Nationwide Ins. Co.,* 104 Wn.2d 543, 553–55, 707 P.2d 1319 (1985). While allowing insurers to participate in the reasonableness hearing process might be more efficient, such an expansion will have to await further legislative action.

We affirm the Court of Appeals decision, which held a release between an insured and a tortfeasor does not extinguish the insurer's subrogation rights if (1) the tortfeasor knows of the insurer's payment and right of subrogation, (2) the insurer does not consent to the settlement,

and (3) the settlement does not exhaust the tortfeasor's assets.

The Court of Appeals is affirmed; defendant's request for costs and attorney fees under RCW 4.84.250, .270, and .290 is denied.

CALLOW, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.