**SHARON STEEL CORPORATION, Plaintiff,**

v.

**AETNA CASUALTY AND SURETY COMPANY, et al., Defendants.**

**David FINKELSTEIN, et al., Plaintiffs,**

v.

**AETNA CASUALTY AND SURETY COMPANY, et al., Defendants.**

**AETNA CASUALTY AND SURETY COMPANY, Cross–Claimant and Appellant,**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY and Hartford Accident & Indemnity Company, Cross–Claim Defendants and Appellees.**

No. 940384.

Supreme Court of Utah.

Jan. 14, 1997.

Michael W. Homer, Jesse C. Trentadue, Claudia F. Berry, Salt Lake City, and Randolph P. Sinnott, Margo T. Wright, Los Angeles, CA, for Aetna.

Mark J. Williams, Jaryl L. Rencher, Salt Lake City, and David F. Abernethy, Philadelphia, PA, and Kevin Gross, Washington, DC, for American Motorists.

Joy L. Clegg, Julianne Blanch, Salt Lake City, for Hartford.

DURHAM, Justice:

Appellant Aetna Casualty and Surety Company appeals the trial court's grant of summary judgment in favor of appellees American Motorists Insurance Co. (AMICO) and Hartford Accident & Indemnity Co. Aetna claims that the trial court erred in holding that it did not have a cause of action for equitable subrogation against AMICO and Hartford for monies it paid in defending UV Industries, Inc. and UV Industries, Inc. Liquidating Trust (Liquidating Trust) in an action brought by the Environmental Protection Agency. On cross-appeal, AMICO argues that the trial court erred in holding that it had a duty to defend the insured parties under its insurance policies with UV Industries, Inc. We agree with both contentions and thus reverse the trial court and remand for further proceedings.

## I. BACKGROUND

### A. The Midvale Pollution and the Underlying Litigation

Between approximately 1908 and 1971, UV Industries, Inc., previously known as U.S. Smelting, Refining, & Mining Co., was engaged in ore milling operations at a 260–acre site in Midvale, Utah. During this time, UV Industries milled and refined ores of copper, lead, and zinc at the Midvale property. The residues, or tailings, of these processes were pumped from the mill and piled or impounded at various locations throughout the site. In total, ten million tons of tailings were generated and dumped in piles up to fifty feet high. In 1971, all milling operations at the site ceased, but the tailings remained on the site in the same uncontained piles in which they originally were dumped. In 1979, UV Industries conveyed most of its assets, including the Midvale property, to Sharon Steel Corporation. UV Industries was subsequently dissolved, and all remaining assets were transferred to the Liquidating Trust.

Between 1984 and 1986, the United States Environmental Protection Agency (EPA) determined that the Midvale property posed an imminent danger to the public health and environment owing to the actual or threatened release of hazardous substances from the toxic mine tailings on the property. The EPA subsequently initiated an action in federal district court against UV Industries, the Liquidating Trust, and Sharon Steel alleging liability under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675, and the Resource Conservation and Recovery Act (RCRA) 42 U.S.C. §§ 6901–6992, for costs arising from the cleanup of the hazardous substances at the Midvale property. *United States v. Sharon Steel Corp.,* No. 86–C–924J (D. Utah filed Oct. 10, 1986). This action was subsequently consolidated with a second action, entitled *United States v. Sharon Steel Corp.,* Civil Action No. 89–C–136 (D. Utah filed Feb. 10, 1989),[1] which also asserted liability against UV Industries, the Liquidating Trust, and Sharon Steel for the cleanup of a slag site on the Midvale property.[2]

### B. The Insurance Policies and Coverage Litigation

During many, but not all, of the years that UV Industries was in business, it purchased insurance to cover its operations. Aetna, Hartford, and AMICO issued consecutive comprehensive general liability insurance policies to UV Industries from January 1966 through April 1980: Aetna issued five policies from January 1966 to January 1971 with limits of $100,000; Hartford issued four policies from January 1971 to March 1975 with limits of $100,000; and AMICO issued three policies from April 1975 to April 1980 with limits of $200,000 and $1,000,000.

The Liquidating Trust gave timely notice of the EPA action to all the insurance companies. Although Aetna, Hartford, and AMICO all disputed whether their policies covered this type of damage, Aetna and

---

1. Neither party addresses the insurers' defense duty with respect to the second action concerning the slag site. Because this action was consolidated with the action for the tailings piles, we assume that the defense costs also covered the second action.

2. The consolidated EPA action was settled in 1990. *See Partial Consent Decree, United States v. Sharon Steel, et al.,* Nos. 86–C–924J, 89–C–136 (D.Utah Nov. 13, 1990).

Hartford nevertheless began paying the defense costs for UV Industries and the Liquidating Trust.[3] Hartford, however, limited its obligation to five percent of defense costs based on a pro rata formula of the number of years it provided coverage.

In 1987, UV Trust and Sharon Steel filed actions in the state district court against several insurance companies, including Aetna, Hartford, and AMICO, to compel them to defend and indemnify UV Trust and Sharon Steel in the underlying action. These two state actions were subsequently consolidated. That same year, UV Trust and Sharon Steel sought a partial summary judgment declaring that Aetna, Hartford, and AMICO had a duty to defend. Ultimately, the trial court held that all three insurance companies had a duty to defend.[4]

Subsequent to the court's ruling, Aetna continued to provide for the defense of the Liquidating Trust, ultimately contributing approximately 95% (about $10.5 million) of the total defense costs. Hartford's contribution continued to be limited to five percent ($500,000). AMICO never paid any defense costs.

### C. The Settlement and Subsequent Cross–Claim

In July 1991, although on notice that Aetna had paid a substantial amount in defense costs for the Liquidating Trust, and that Aetna had also requested contribution, AMICO and Hartford settled with Sharon Steel and the Liquidating Trust, paying $475,000 and $500,000[5] respectively, for a release from any further obligations. Specifically,

the Hartford settlement agreement provided that:

> Upon final execution of this Agreement, Hartford shall have no further duties or obligations to Sharon, UV or UV Trust based upon, arising out of, or related in any way to the Hartford Policies ... [and] shall have no further duties to pay any defense or indemnity costs in connection with the USA Actions.

On August 14, 1991, Aetna filed its cross-claim against Hartford and AMICO, seeking equitable subrogation and contribution for the defense costs it paid on behalf of the Liquidating Trust.[6] Upon motion for summary judgment, however, the trial judge held that Aetna did not have an action for equitable subrogation against Hartford or AMICO. The judge reasoned that since an insurer's subrogation right is derivative of the rights of its insured, the insured parties' settlement with Hartford and AMICO extinguished any claim that Aetna may have had for contribution.

Aetna appeals to this court. It claims that the trial court erred in determining that the settlement extinguished Aetna's subrogation claim. AMICO also cross-appeals, claiming that if this court finds that Aetna does have a cause of action for equitable subrogation, the trial court erred in determining that AMICO had a duty to defend under its policies with UV Industries.

### II. ANALYSIS

### A. Applicability of the Statute of Limitations

■ Hartford and AMICO initially argue that even if Aetna has a valid subrogation

---

3. Since the Liquidating Trust was, in effect, responsible for any liability incurred by UV Industries, this opinion refers only to the Liquidating Trust.

4. As discussed in more detail in section II, the trial court initially held that AMICO's policies with UV Industries excluded coverage for the type of pollution alleged by the EPA. Over a year later, however, it reversed its prior ruling, finding that the EPA had alleged some contamination that potentially was covered under AMICO's policies.

5. The settlement agreement provided that Hartford would pay the insured $250,000 in release

of all claims, but would continue to pay its 5% share of the defense costs. As the trial court noted, it is unclear whether the $250,000 was included in or in addition to the approximately $500,000 paid by Hartford in defense costs. The briefs of the parties reflect that Hartford settled for $500,000. We assume that Hartford paid only $500,000 for both the settlement and the defense contributions.

6. Aetna's cross-claim does not address any costs for providing a defense for Sharon Steel. Nor does Aetna claim in its brief that it seeks contribution for monies paid in behalf of Sharon Steel. We therefore limit our decision to the costs paid for the defense of the Liquidating Trust.

claim, it is time barred by the applicable statutes of limitations. Although the trial court did not grant summary judgment on the basis of the statute of limitations, this court may nevertheless affirm summary judgment on any ground that finds support in the record. *K & T, Inc. v. Koroulis,* 888 P.2d 623, 628 (Utah 1994).

AMICO and Hartford contend that under the limitations period for an action based on contract or, in the alternative, for an action based in equity, Aetna's cross-claim was not timely filed. *See* Utah Code Ann. § 31A–21–313(1) (three years for action on written policy or contract of insurance); *id.* § 78–12–25 (four years for actions not otherwise provided for). They claim that since Aetna started to pay defense costs in February 1987, for which it seeks reimbursement, the bringing of the cross-claim in August 1991 was time barred. *See Canadian Indemnity Co. v. K & T, Inc.,* 745 F.Supp. 661, 663–64 (D.Utah), *aff'd* 953 F.2d 1391 (10th Cir.1990) (holding that under claim for breach of duty to defend, limitations period accrued under Utah Code Ann. § 31A–21–313(1) when insurer began to incur defense expenses). We need not, however, decide at this time which statutory time period applies to the present action or when that time period began, because we find that Aetna's cross-claim relates back to the filing of the Liquidating Trust's original complaint in 1986.

■■■ The issue of whether cross-claims relate back to the filing of the complaint is one of first impression in Utah. Neither of the statutes governing the filing of cross-claims or supplemental pleadings provides that these pleadings relate back to the date of the filing of the original complaint.[7] We must therefore look to other sources for guidance. Other jurisdictions that have addressed this issue have distinguished between those counterclaims and cross-claims "wherein the defendant seeks to reduce the amount a plaintiff can recover, such as by recoupment, contribution, or indemnity, and those wherein the defendant is seeking affirmative relief." *United States ex rel. Bros. Builders Supply Co. v. Old World Artisans, Inc.,* 702 F.Supp. 1561, 1569–70 (N.D.Ga. 1988); *see also Appelbaum v. Ceres Land Co.,* 546 F.Supp. 17, 20 (D.Minn.1981), *aff'd,* 687 F.2d 261 (8th Cir.1982); *State ex rel. Egeland v. City Council,* 245 Mont. 484, 803 P.2d 609, 613 (1990). In general, where a defendant's claim is similar to a pure defense, then the filing of the complaint tolls the statutory period. *See* 51 Am.Jur.2d *Limitation of Actions* § 76 (1970) ("[A]s long as the courts will hear the plaintiff's case, time will not bar the defense which might be urged thereto and which grew out of the transaction connected with the plaintiff's claim."). However, where the defendant's claim is an "affirmative independent cause of action not in the nature of a defensive claim," then the claim must be filed within the applicable statutory period. *Old World Artisans,* 702 F.Supp. at 1569. In *Old World Artisans,* the Federal District Court for the Northern District of Georgia held that a cross-claim for contribution from a co-defendant related back to the filing of the original complaint. The court reasoned that since the cross-claim involved payment for the same material that the plaintiff sought payment for, it was "not wholly an affirmative, independent cause of action. It is based in part upon sums that [the cross-claimant] may have to pay to [the plaintiff] and for damages for which [the cross-claimant] may be liable to [the plaintiff]". *Id.* at 1570.

■■■ As was the case in *Old World Artisans,* Aetna's cross-claim is likewise not

---

7. Utah Rule of Civil Procedure 13(f), governing the filing of cross-claims, provides:

   A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject-matter ... of the original action.... Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

Rule 15(d), governing the filing of supplemental pleadings, provides in part:

   Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.

wholly distinct from the claim of the insured parties against AMICO and Hartford. The cross-claim involves contribution for the same defense costs that the insured sought from AMICO, Hartford, and Aetna. The cross-claim is therefore not an independent action for affirmative relief. It is based in part upon the sums that Aetna paid to defend the insured which were alleged in the original complaint. We therefore hold that the cross-claim, to the extent that it seeks contribution for sums Aetna paid in defending the plaintiff, relates back to the date of the filing of the original complaint and was therefore timely filed.

### B. AMICO's Defense Obligations Under its Insurance Policies

■ Before we reach the merits of Aetna's subrogation claim, we must first address AMICO's cross-appeal and determine whether AMICO had a duty to defend arising under its insurance policies with UV Industries. We have previously held that an insurer's duty to defend is broader than its duty to indemnify. Its defense duty arises when the insurer ascertains facts giving rise to potential liability under the insurance policy. *Deseret Fed. Sav. & Loan Assoc. v. United States Fidelity & Guar. Co.*, 714 P.2d 1143, 1146 (Utah 1986). This potential liability is determined by referring to the allegations in the underlying complaint. When those allegations, if proved, could result in liability under the policy, then the insurer has a duty to defend. *Id.* at 1147. AMICO claims that the allegations of the EPA's complaint, even if proved, could not give rise to liability under its policies with its insured.

As set forth above, from April 1, 1975, to April 1, 1980, AMICO contracted with UV to provide comprehensive general liability insurance (known in the industry as CGL policies). The insurance policies provided that AMICO would pay the insured "all sums which the insured shall become legally obligated to pay as damages ... because of: (a) bodily injury or property damage, ... caused by an occurrence...." Moreover, the policies provided that AMICO would defend its insured in "any suit against the insured alleging such injury or property damage and

seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false, or fraudulent." Similar to most standard CGL policies, however, AMICO's policies generally excluded coverage for pollution:

> This policy does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

The pollution exclusion, however, also contained an exception where the "discharge or dispersal, release or escape is *sudden and accidental.*" (Emphasis added.)

In July 1988 the trial court initially ruled that the damage alleged in the underlying CERCLA action fell under the pollution exclusion clause contained in AMICO's policies and was *not* "sudden and accidental" as required by the exception's language. Therefore, it held that AMICO did not have a duty to defend. After finding that the language of the exception to the exclusion was "clear and unambiguous," the court reasoned that although the term "sudden" encompassed whether the discharge was "expected," it also had a temporal element requiring it to be "instantaneous and abrupt." The court then held that since the buildup of tailings piles was alleged to have occurred over a 70–year period, "[t]here can be no doubt that the United States is alleging gradual contamination and is not alleging a sudden release."

However, in March 1989, the court considered additional evidence, specifically a 1988 EPA report entitled "Final Draft Remedial Investigation Report." That report indicated that pollution may have occurred from "sudden" high-wind events or slope failures from the stored tailings, after the gradual dumping had taken place. Thus, based on the pleadings, the court held that because genuine issues of material fact existed as to whether some of the pollution damage was "sudden and accidental," there was a possibility that AMICO's policies covered the dis-

charges, and thus AMICO had a duty to defend.

AMICO, however, never paid any defense costs because a disputed issue still remained as to which entities were covered by the AMICO policies.[8] After AMICO submitted its brief arguing why the Liquidating Trust was not covered, but before the issue was decided, AMICO settled with both the Liquidating Trust and Sharon Steel. AMICO now argues that if its settlement with the insured did not cut off Aetna's subrogation right, the trial court erred in determining that AMICO had a duty to defend.

AMICO agrees with the trial court's interpretation of the exception to its pollution exclusion clause to the extent that the term "sudden" denotes a time-specific event and that long-term discharges of pollutants are not "sudden." However, AMICO contends that the court erred in reversing its first decision and finding that the EPA had later alleged "sudden" discharges from the tailings piles. AMICO argues that "a gradual and long-term course of conduct in discharging pollutants does not qualify as 'sudden,' even if some of the individual discharges would be 'sudden' if viewed in isolation." It cites federal case law from the Tenth Circuit which holds that if the discharges were part of a series of "routine events which occurred as a concomitant of regular business operations," then the fact that individual discharges may have occurred both suddenly and accidentally, when viewed in isolation, does not make the "overall pattern of discharges" sudden and accidental. *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1529–30 (10th Cir.1995); *accord Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co.,* 962 F.2d 1484, 1490 (10th Cir.1992).

■ Before determining the merits of AMICO's contention, we examine the trial court's initial interpretation of the "sudden and accidental" exception to the pollution exclusion clause and determine whether it correctly concluded that the language is unambiguous and that the term "sudden" includes a temporal element. Whether a contract term is ambiguous is a question of law, which we review for correctness. *Interwest Constr. v. Palmer,* 923 P.2d 1350, 1358 (Utah 1996) (citing *Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995)). "If a contract is unambiguous, a trial court may interpret the contract as a matter of law, and we review the court's interpretation for correctness." *Id.* at 1358–59.

Although this court has never had the opportunity to interpret these terms, the "sudden and accidental" exception to pollution exclusion clauses in CGL policies has been the subject of considerable debate in the federal courts and other jurisdictions. One line of authority rejects the holding adopted by the trial court and reasons that because CGL policies do not define "sudden and accidental," and because dictionary definitions vary [9] and the drafting history of the policy is confused, the language is ambiguous. *See, e.g., Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1091–92 (Colo.1991); *Claussen v. Aetna Cas. & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989); *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 456 N.W.2d 570, 573 (1990). As a result, these jurisdictions, resorting to maxims of contract interpretation such as *contra preferentum,* interpret the terms of the contract against the contract's drafter and thus in favor of the insured and ultimately find that the terms "sudden and accidental" mean only "unexpected or unintended" and do not contain a temporal element. Under this interpretation, a policy may cover the pollution even where it occurs gradually over time, as long as it was not expected or intended. *See,*

---

**8.** UV Industries was the only entity named under AMICO's policies. In its brief, AMICO argues that, in the alternative, it did not have a duty to defend the Liquidating Trust since it was not a named insured. Although we need not reach this issue as to AMICO since we ultimately hold that AMICO did not have a duty to defend under its policies, because Hartford also asserts this same claim, we summarily address this issue in the next section. *See infra* note 15.

**9.** Dictionaries provide various, conflicting definitions of "sudden," defining the word to mean "unexpectedly," "without notice," or "unforeseen," and sometimes "abrupt," "rapid," or "swift."

*e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Corp.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 705, 607 N.E.2d 1204, 1218 (1992); *Morton Int'l Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831, 847–49 (1993), *cert. denied,* 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wash.2d 50, 882 P.2d 703, 720–21 (1994); *Joy Techs., Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493, 498–99 (1992).

■ However, we believe the better reasoning, adopted by a majority of the courts, including the U.S. Court of Appeals for the Tenth Circuit, and followed by the trial court here, is that the language is unambiguous and that the term "sudden" contains a temporal element, such as being abrupt or quick, and the term "accidental" means something akin to unintended or unexpected.[10] *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 999 F.2d 489, 493 (10th Cir.1993). The courts adopting this view have reasoned that the term "sudden" includes an element of "immediacy," "quickness," or "abruptness," because the contrary reading would render the word "accidental" (which clearly means unexpected) redundant. *Id.* (citing *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 446 (D.Kan. 1990)).

This interpretation has also been followed by the Utah Court of Appeals in *Gridley Associates v. Transamerica Insurance Co.*, 828 P.2d 524 (Utah.Ct.App.1992). After reviewing the interpretation of numerous other courts, the court of appeals found that the decisions holding that the terms were unambiguous were better reasoned, and thus opined that "[w]hile the word connotes a sense of unexpectedness, 'sudden' within the 'sudden and accidental' clause cannot be defined without reference to a temporal element, specifically immediacy, abruptness, and quickness." *Id.* at 527. We agree.

Having determined that the terms are unambiguous, we now turn to whether the trial court correctly held that, according to the facts of this case, some of the pollution could be deemed "sudden" to include it within the coverage of the CGL policy. Generally, courts have agreed that "[i]t is the release of pollutants itself that must have occurred suddenly, if the exception is to apply." *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 555 N.E.2d 568, 571 (1990). In cases where the release of pollution occurred abruptly over a relatively short period of time, courts are more likely to find that the discharge was sudden. For example, in *Gridley,* the Utah Court of Appeals held that the release of gasoline from an underground gas line over a three-month period was "sudden," because it was caused by an unexpected break in the line resulting in "an immediate and abrupt flow of gasoline from the severed line every time the pump was activated." 828 P.2d at 527. The court rejected the argument that because the spill lasted for an extended period of time it was gradual, and held that the policy only requires that the discharge itself be "sudden" to be covered under the policy. *Id.* at 527–28.

■ However, the question becomes more problematic when the discharge of pollutants has occurred over a long period of time. The trial court here, focusing on the alleged "sudden" release of toxic substances from the tailings themselves, held that this would po-

---

**10.** Other jurisdictions that also find the terms "sudden and accidental" to be unambiguous include *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 153–54 (7th Cir.1994) (Indiana law); *Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893, 894 (9th Cir.1994) (California law); *Aetna Cas. & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707, 710 (8th Cir.1992) (Missouri law); *Northern Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 193–94 (3d Cir.1991) (Pennsylvania law); *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1428 (2d Cir.1991) (New York law); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66, 72 (1st Cir.1991) (Maine law); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 34–35 (6th Cir.1988) (Kentucky law); *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 33–34 (1st Cir.1984) (New Hampshire law); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 704–05 (Fla.1993); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 555 N.E.2d 568, 572 (1990); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392, 397 (1991); *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888, 892 (Minn. 1994); *Waste Management Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, 379 (1986); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992).

tentially put the pollution within the exception to the exclusion. However, most courts (including the Tenth Circuit in three cases applying Utah law) have focused on whether the pollution was a "concomitant" of regular business activity rather than a series of unrelated accidents. They reason that if the releases were part of the overall business operations, then even if some of the releases viewed individually may have been "sudden," this does not "alter the conclusion that the overall pattern of discharges was not 'sudden and accidental.'" *Quaker State,* 52 F.3d at 1529; *accord Anaconda Minerals Co. v. Stoller Chem. Co.,* 990 F.2d 1175, 1178–79 (10th Cir.1993); *Hartford Accident & Indem. Co.,* 962 F.2d at 1487–90 (10th Cir.1992). In *Quaker State,* oil and other wastes from a company which recycled or re-refined used automobile and industrial oils were released in part from unlined pits and overflows from storage tanks. Although the insured alleged that all these releases were "sudden and accidental," the court ultimately held that "[s]imply put, courts should not engage in a microanalysis of discrete discharges which are claimed to be 'sudden and accidental' when the discharges otherwise arise as commonplace events which occur in the course of daily business." *Quaker State,* 52 F.3d at 1529; *see also Ray Indus. Inc. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 768 (6th Cir. 1992) (rejecting the insured's argument that each release in an ongoing pattern of releases "was sudden, when viewed in isolation" because "under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment"); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 933 F.2d 66, 75 (1st Cir.1991) ("Mere speculation under these circumstances that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence."); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34–35 (6th Cir.1988) (finding that pollution occurring over a period of more than seven or eight years is not "sudden"); *accord Cincin-*

*nati Ins. Co. v. Flanders Elec. Motor Serv. Inc.,* 40 F.3d 146, 153–54 (7th Cir.1994); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30, 33–34 (1st Cir.1984); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700, 704–05 (Fla.1993).

We find this line of reasoning to be the better approach. One commentator notes that this approach is consistent with the purpose behind insurance contracts of protecting the insured from fortuitous incidents, "not to cover injuries resulting from industrial practices whose harmfulness was highly likely." Sharon M. Murphy, Note, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability,* 45 Vand. L.Rev. 161, 167–78 (1992). Hence, where incidents of pollution appear to be more like normal business activities, the costs of cleanup should be included in the normal cost of business by the insured. Furthermore, holding the industrial community liable for its pollution may be more likely to motivate industry to improve its practices and become safer and cleaner. *See id.*

In the instant case, we find that the release of the toxic materials from the tailings which were dumped as part of the insured's normal course of operation over a 60– to 70–year period was not "sudden and accidental," even if some of the pollution, viewed in isolation, could be deemed to have occurred suddenly. We thus reverse the trial court's decision and hold that the pollution alleged in the EPA action fell within the pollution exclusion of AMICO's policies with UV Industries. As a result, AMICO did not have an obligation to defend in the underlying action. Aetna's action for equitable subrogation is therefore limited to recovery from Hartford.[11]

### C. Aetna's Right to Subrogation for Defense Costs from Co-Insurers and the Effect of Hartford's Settlement

We now reach Aetna's claim that it has a cause of action for equitable subrogation

---

**11.** One of Hartford's insurance policies with UV Industries also contains a pollution exclusion clause. Thus, on remand, the lower court should exclude this policy when allocating defense costs between Hartford and Aetna.

against Hartford. We recently held in *State Farm Mutual Automobile Insurance Co. v. Northwestern National Insurance Co.,* 912 P.2d 983, 985–87 (Utah 1996), that an insurer which settled a claim that should have been covered by another insurance company could recover the amount paid in settlement under the equitable doctrine of subrogation. We reasoned that equity allowed an insurer which paid a debt in full that was owed by another to obtain reimbursement from those who ought to have paid it. *Id.* at 985. This court has also extended this right to an action to recover defense expenditures. *National Farmers Union Property & Cas. Co. v. Farmers Ins. Group,* 14 Utah 2d 89, 377 P.2d 786, 787–88 (1963) (holding that insurer who had successfully defended an insured which should have been covered and thus defended by another insurance company could recover the costs and attorney fees under the doctrine of subrogation). However, this court has never addressed whether the doctrine of subrogation also applies to defense costs where two or more insurance companies were equally obligated to defend. We thus look to other jurisdictions for guidance.

**1. Duty to Defend Where There Are Two or More Co-Insurers**

Whether an insurer can compel contribution from a coinsurer who is equally obligated to defend is a question that has resulted in a split of authority. Some jurisdictions have held that because the duty to defend is personal to each insurer, the obligation is several and where many carriers are obligated to defend, each separate carrier is neither entitled to divide the duty nor require contribution from another absent a specific contractual right. *United States Fidelity &*

Guar. Co. v. Tri–State Ins. Co., 285 F.2d 579, 582 (10th Cir.1960). However, the trend in other jurisdictions has been to allow an insurer, under the doctrines of contribution or equitable subrogation, to recover costs of defense from other insurers who were equally obligated to defend yet failed to do so. *See National Indem. Co. v. St. Paul Ins. Cos.,* 150 Ariz. 458, 724 P.2d 544, 545 (1986) ("Under the principle of equitable subrogation, the insurer which has performed the duty to provide a defense to its insured should be able to compel contribution for a share of the cost of defense from another insurer who had a similar obligation to the same insured but failed to perform it."). The Arizona court reasoned that an insurer should not be encouraged to avoid its responsibility to provide a defense for its insured, nor should that insurer be rewarded for breaching its duty under its insurance contract. *Id.* In responding to the Tenth Circuit's approach, one scholar comments:

> These holdings are indefensible. The courts are ignoring realities and encouraging insurers who are not concerned with their obligations to their insured in the hope that someone else will step into the breach.... Further, as a matter of public policy, courts should be demanding that insurers give prompt defense of claims to policyholders rather than to tolerate the shifting of responsibility with such impunity.

7c John Allan Appleman, *Insurance Law and Practice* § 4691, at 278 (Walter F. Berdal ed., 1979). *See also Continental Cas. Co. v. Zurich Ins. Co.,* 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455, 461 (1961).[12]

We agree with those jurisdictions that have allowed contribution where one

---

**12.** Hartford argues that the above arguments apply only where another insurance company has breached its duty to defend by failing to pay any defense costs. It thus reasons that since it tendered $500,000 (or five percent) of the defense costs, it did not breach its defense obligations, and therefore, equitable subrogation is not available. *See Aetna Cas. & Sur. Co. v. Mutual of Enumclaw Ins. Co.,* 121 Idaho 603, 826 P.2d 1315, 1318–19 (1992) (holding that co-insurer must totally breach its duty to defend for another insurer to compel contribution); *Carolina Cas. Ins. Co. v. Oregon Auto. Ins. Co.,* 242 Or. 407, 408

P.2d 198, 203 (1965). However, we can find no distinction between an insurer that breaches its duty to defend by failing to pay anything at all and one that pays less than its fair share. *See Haskel, Inc., v. Superior Court,* 33 Cal.App.4th 963, 39 Cal.Rptr.2d 520, 526 n. 9 (1995) ("[W]e will treat [the insurer's] acceptance of a 13% share of the defense burden as the equivalent of a defense denial. Such a unilateral limitation of its responsibility is not justified. If it owes any defense burden it must be fully borne ... with allocations of that burden among other responsible parties to be determined later.").

insurer has paid more than its fair share of the defense costs. Where it can be shown that a co-insurer failed to defend or failed to pay its share of the defense expenses, that insurer should not be rewarded and payment excused when another co-insurer has taken upon itself the provision of that defense. Holding otherwise would not only lead to an inequitable result but may also conflict with our stated policy of encouraging prompt payments to the insured, leaving disputes concerning coverage to be determined later. *See State Farm,* 912 P.2d at 987. We thus conclude that Aetna does have a claim for equitable subrogation to compel Hartford to contribute its fair share of the defense expenditures.[13]

**2. Effect of Hartford's Settlement with Insured**

■ Hartford next contends that even if Aetna had a right to contribution for the defense costs it expended, Hartford's settlement with the insured extinguished Aetna's right. Hartford initially argues that under Utah law, "any defenses that are valid against the insured are also valid against the [subrogated] insurer." *Fashion Place Invest., Ltd. v. Salt Lake County/Salt Lake County Mental Health,* 776 P.2d 941, 945 (Utah.Ct.App.1989). Therefore, since the insured settled and released all claims against Hartford, Hartford argues that that release acts as a complete defense against Aetna's subrogation claims. We disagree.

In third-party insurance contexts, this court has held that where the insured settles with a tortfeasor, and the tortfeasor and/or its insurer was on notice of the other insurer's subrogation right, then the settlement and release will not affect the insurer's right of subrogation. *Educators Mut. Ins. Ass'n v. Allied Property & Cas. Ins. Co.,* 890 P.2d

1029, 1031 (Utah 1995) ("[A] settlement between an injured party and a tort-feasor who has knowledge of the subrogation rights of the injured party's insurer does not destroy the subrogation claim of the injured party's insurer."); *see also Transamerica Ins. Co. v. Barnes,* 29 Utah 2d 101, 106, 505 P.2d 783, 787 (1972).[14] This approach is also supported by a majority of other jurisdictions. *See Farmers Ins. Group v. Martinez,* 107 N.M. 82, 752 P.2d 797, 799 (Ct.App.1988); *Leader Nat'l Ins. Co. v. Torres,* 113 Wash.2d 366, 779 P.2d 722, 724 (1989) (*Torres II*) ("The overwhelming majority of states allows a subsequent equitable subrogation action by an insurer if the insurer did not consent to the release and the tortfeasor knew of the insurer's interest prior to the release."); 16 Mark S. Rhodes, *Couch on Insurance 2d* § 61:201 (Rev. ed.1983). These authorities reason that allowing a general release between the tortfeasor and the insured " 'constitutes a trap for the unwary insured plaintiff' " and " 'encourages fraud or, at the very least, sharp practice on the part of the tortfeasor or his insurance carrier.' " *Leader Nat'l Ins. Co. v. Torres,* 51 Wash.App. 136, 751 P.2d 1252, 1254 (1988) (*Torres I*) (quoting *Home Ins. Co. v. Hertz Corp.,* 71 Ill.2d 210, 16 Ill.Dec. 484, 486–87, 375 N.E.2d 115, 117–18 (1978)). Ultimately, these courts find that:

> To require [the unsophisticated insured] to execute a release of all claims, even though the tortfeasor has knowledge of the insurer's interest and the probable existence of a standard insurance policy provision obligating the insured to protect the insurer's subrogation rights, is simply not consistent with fair dealing and ought not to be encouraged.

*Id.*

This rationale was affirmed in *Torres II,* 779 P.2d at 725, where the Washington Su-

13. We also find unpersuasive Hartford's argument that Aetna lost its right to equitable subrogation because it failed to take timely action to protect its rights. As we held in *State Farm,* 912 P.2d at 985–87, an insurer may wait until it has paid its insured in full before instigating an action to compel reimbursement.

14. We acknowledge that in *Hill v. State Farm,* 765 P.2d 864, 867 (Utah 1988), this court noted that a subrogee's rights are subject to any limita-

tions placed on the rights of subrogor and thus an insurer is precluded from any future compensation from the tortfeasor who had been released by the plaintiff even though the tortfeasor's insurance company knew of the insurer's subrogation rights. However, in light of the more recent language contained in *Educator's Mutual* and the overwhelming support by a majority of the other jurisdictions, we now disavow the position taken in *Hill.*

preme Court stated that although equities were also in favor of encouraging settlements and avoiding litigation, "such a speculative result is not equitably purchased at the price of either abandoning the subrogation rights of the insurer or limiting recovery to reimbursement from the injured insured."

We believe this same reasoning is equally applicable to co-insurers where one insurer is on notice that another has paid all, or more than its share, of the defense costs. Indeed, there is probably even more of an incentive for an insurer to engage in "sharp practices" to settle for a limited amount with the possibly unsophisticated insured to avoid the subrogation rights of another insurer who has paid substantial defense costs. We therefore conclude that it is more equitable to hold that an insurer who is on notice that another insurer has been paying significant defense costs should not be allowed to settle for a minimal sum to avoid having to contribute its fair share.[15]

### 3. Reasonable Defense Expenditures

Hartford finally argues that even if we find that its settlement with the insured did not defeat Aetna's subrogation claim, we must remand this issue for the trial court to determine if the expenses paid by Aetna were reasonable. We agree. In general, where an insurer breaches its duty to defend, the insured is entitled to recover the amount it paid for *reasonable* attorney fees. *Crist v. Insurance Co.,* 529 F.Supp. 601, 605–06 (D.Utah 1982); *see also IMCERA Group, Inc. v. Liberty Mut. Ins. Co.,* 50 Cal.Rptr.2d 583, 603, 47 Cal.App.4th 699 (Ct.App.1996)

("Where an insurer wrongfully refuses to provide a defense, it 'is manifestly bound to reimburse its insured for the full amount of any obligation reasonably incurred by him.... If there be uncertainty as to the nature or extent of the services reasonably to be rendered by counsel engaged by the insured, that uncertainty must be resolved against [the] insurer.'" (quoting *Arenson v. National Auto. & Cas. Ins. Co.,* 48 Cal.2d 528, 310 P.2d 961 (1957))), *review granted,* 54 Cal.Rptr.2d 41, 917 P.2d 1164 (1996); 7c John Alan Appleman, *Insurance Law and Practice* § 4691, at 261 (Walter F. Berdal ed., 1979) ("[A]ttorneys' fees incurred by the insured in the defense of an action must be shown to be reasonable to allow a recovery thereof from the insurer."). Where the claim for breach of the duty to defend is between two insurers, courts have also held that one insurer is entitled to reimbursement only for those fees that are reasonable. *Liberty Mut. Ins. Co. v. Continental Cas. Co.,* 771 F.2d 579, 581–82 (1st Cir.1985). We agree. We do not accept Aetna's proposition that Hartford, in failing to pay its fair share of the fees, waived its right to contest the reasonableness of the fees paid by Aetna.[16] As noted by the First Circuit in *Liberty Mutual,* 771 F.2d at 582, there might have been merit to this claim if Hartford had acted in bad faith or had attempted to mislead Aetna. Hartford, however, tendered a five percent share in the belief that that was all it was obligated to pay for the defense of the Liquidating Trust. We therefore conclude that although Hartford may not have paid its fair share, it should not be required to pay anything beyond the reasonable expenses paid

---

**15.** Hartford alternatively argues that it did not have a duty to defend the Liquidating Trust because it was not a named insured under its policies with UV Industries. We find this reasoning unpersuasive in this case where the Liquidating Trust was formed to receive all remaining assets of the dissolved UV Industries. *See Central Trust Co. v. Chicago Auditorium Ass'n,* 240 U.S. 581, 590, 36 S.Ct. 412, 414, 60 L.Ed. 811 (1916) ("[A] stipulation against assignment without consent ... may be assumed ... [to] not prevent an assignment by operation of law" to a trustee.); *National Am. Ins. Co. v. Jamison Agency, Inc.,* 501 F.2d 1125, 1129 (8th Cir.1974) (finding prohibition against assignment not applicable where liability insurance transferred to sole stockholder by operation of statute upon

dissolution). This court has also held that "inasmuch as [a corporation] is to be held responsible for the liability of [a predecessor corporation under the applicable state statute], it is entitled to the protection which [the predecessor corporation] had ... at the time of the accident." *Aetna Life & Cas. v. United Pac. Reliance Ins. Cos.,* 580 P.2d 230, 232 (Utah 1978) (concerning surviving corporation in merger).

**16.** Aetna's response to this argument was asserted only as against AMICO. Aetna never responded to Hartford's argument concerning the reasonableness of the fees. We presume, however, that Aetna would also make this same argument in response to Hartford's claim.

by Aetna. As a result, we remand this case to the trial court to determine which defense expenditures were reasonable.[17]

### D. Apportionment of Defense Costs

Because this court finds that Aetna is entitled to be reimbursed for those defense expenses it paid in excess of its fair share, we deem it prudent to offer guidance to the trial court in apportioning those defense costs.[18]

■ In general, when apportioning defense costs among insurers, courts "apply equitable principles ... unless express policy language decrees the method of apportionment." *IMCERA Group*, 50 Cal.Rptr.2d at 610. Those jurisdictions which have addressed this issue have been divided over which method most equitably allocates defense and indemnity costs between multiple insurers in continuous injury cases.[19] Hartford argues that we should employ the "time on the risk" method, which allocates damages based on the relative period of time during which coverage was provided by each insurer's respective policies. Under this method, each triggered policy would bear a share of the total damages proportionate to the number of years it was on the risk relative to the total number of years of coverage triggered. *See Insurance Co. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1224–25 (6th Cir. 1980); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 685 F.Supp. 621, 626 (E.D.Mich. 1987).

■ However, we think the more equitable approach, and the one that better reflects what each insurer contracted to provide is one that not only looks at the years that each insurer was on the risk, but also takes into account the respective policy limits. *See Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690, 707–10 (1996) (affirming prior appeals court decision to allocate costs among all triggered insurance policies according to policy limits, multiplied by years of coverage).

In single incident cases, courts generally prorate according to the policy limits where multiple policies shared the same risk but had inconsistent "other insurance" clauses. *Id.* 52 Cal.Rptr.2d at 707–08; *see St. Paul Mercury Ins. Co. v. Underwriters at Lloyds of London*, 365 F.2d 659, 663 (10th Cir.1966). This method of apportionment is claimed to be meritorious on the grounds that it is simple to administer, affixes the responsibility of the insurer in proration to the total coverage which that insurer undertook to provide, and acknowledges that insurers do not stand on an equal footing where there are significantly different liability limits.

■ We agree that any allocation of defense costs should take into account the policy limits of each insurer. We thus conclude that in continuing injury cases, such as the instant case, where multiple policies are triggered for consecutive injuries, multiplying those policy limits by the years of coverage results in a more equitable allocation than proration based on policy limits alone.

17. In determining whether the attorney fees paid by Aetna were reasonable, this court has set forth several factors to consider, which include but are not limited to

"the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved."

*Salmon v. Davis County*, 916 P.2d 890, 893 (Utah 1996) (quoting *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 269 (Utah 1992)).

18. Neither party has provided a thorough briefing on this issue. Aetna summarily sets forth the different allocation methods employed by various courts without addressing the merits of each method, nor does it explain how these methods might apply to the instant case. We have therefore been limited to our own resources in fashioning an equitable apportionment method.

19. Methods used by other jurisdictions include apportionment based on equal shares, *IMCERA Group, Inc. v. Liberty Mut. Ins. Co.*, 47 Cal. App.4th 699, 50 Cal.Rptr.2d 583, 609–11 (1996); apportionment based upon the premiums paid, *Insurance Co. v. Employers Liab. Assur. Corp.*, 163 F.Supp. 143, 147, 151 (S.D.Cal.1958); or apportionment using a "maximum loss" method, *Mission Ins. Co. v. Allendale Mut. Ins. Co.*, 95 Wash.2d 464, 626 P.2d 505, 507–08 (1981). After reviewing these decisions, we are unpersuaded that any of them reflects the most equitable method of allocating the defense costs in the instant case.

For many of the years that the insured in the instant case was disposing of hazardous waste, it was either self-insured, uninsured, or for some other reason had no outside coverage. In other similar circumstances, courts have been faced with whether defense and damage costs must be borne, in part, by the insured. In *Forty–Eight Insulations,* 633 F.2d at 1224–25, the Sixth Circuit held that in continuous injury cases, the allocation of defense and indemnity costs should also take into account the years for which the insured had no insurance coverage and allocate that pro-rata share to the insured. It reasoned that the insured should pay its "fair share" of defense costs for uninsured periods:

> The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.
>
> ... The different insurance companies will pro-rate defense costs among themselves. It is reasonable to treat [the insured] as an insurer for those periods of time that it had no insurance coverage. Were we to adopt [the insured's] position on defense costs a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all ... actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support[s] such a result.

*Id.* (footnotes omitted). Thus the federal court, in a case involving long-term exposure to asbestos, allocated defense costs based upon each insurer's "time on the risk" and held that the insured should be responsible for defense costs for those years in which it was uninsured or self-insured. *See also Stonewall Ins. Co. v. Asbestos Claims Management Corp.,* 73 F.3d 1178, 1202 (2nd Cir. 1995) (" '[A] fair method of allocation appears to be one that is related both to time on the risk and the degree of risk assumed. When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable.' " (quoting *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 995 (1994))). This reasoning is supported by numerous courts: *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365, 371–72 (5th Cir.1993) (applying Texas law: finding that each party's liability for defense costs is limited by each party's contract, and insured should be liable for those years when insured was uninsured or self-insured); *Porter v. American Optical Corp.,* 641 F.2d 1128, 1145 (5th Cir.1981) (same); *Fireman's Fund,* 685 F.Supp. at 626 (applying "time on the risk" and requiring policyholders to bear costs of defense "for any period of the policyholder's(s') alleged use during which the policyholder(s) had no coverage or cannot identify the insurer"); *Crist v. Insurance Co.,* 529 F.Supp. 601, 604 (D.Utah 1982).[20]

We agree with the view expressed in *Forty–Eight Insulations* that the property owners must be prepared to pay their "fair share" of defense costs for those years that they were without insurance coverage. 633 F.2d at 1224–25.[21] As noted by one court, "[A] [policyholder] who has no insurance before 1967 cannot reasonably expect that its insurer will pay defense costs for property damage that occurred in 1946." *IMCERA Group,* 50 Cal.Rptr.2d at 607. Thus, we remand the case with instructions to the trial court to fashion an equitable allocation

---

**20.** We are unpersuaded by the D.C. Circuit's reasoning in *Keene Corp. v. Insurance Co.,* 667 F.2d 1034, 1050–51 (D.C.Cir.1981), where the court concluded that all triggered insurance policies are liable in full for the indemnity and defense costs for injuries that occurred from asbestos exposure. *See also J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502, 507–09 (1993) (concluding that insurers should bear all defense costs even though manufacturer was uninsured when some injury occurred).

**21.** With this result, part of the defense costs expended by Aetna should have been paid for by the Liquidating Trust and will have to be accounted for by the trial court.

scheme that takes into account the years when the insured was uninsured and to allocate that share to the insured.[22]

## III. CONCLUSION

As a result of the foregoing, we conclude that (1) AMICO did not have a duty to defend under its insurance policies with UV Industries, and (2) Aetna has a valid cause of action for equitable subrogation against Hartford to receive contribution for the reasonable defense costs that Aetna paid on behalf of UV Industries and the Liquidating Trust. This case is therefore remanded to the trial court for further proceedings as between Aetna and Hartford, including an allocation of the reasonable defense costs consistent with this opinion.

ZIMMERMAN, C.J., and HOWE, and RUSSON, JJ., concur in Justice DURHAM's opinion.

STEWART, Associate C.J., does not participate herein.

---

**22.** We recognize that the principles set forth in this opinion may not lend themselves to simple and straightforward application to the factual circumstances of this case. We therefore grant considerable discretion to the trial court in devising a formula which best reflects our decision.