2001 UT 48

**FIRE INSURANCE EXCHANGE, Plaintiff and Appellee,**

v.

**The ESTATE OF Otto F. THERKELSEN, Jr., and Steven A. Ness, Defendants and Appellant.**

No. 990716.

Supreme Court of Utah.

June 8, 2001.

Rehearing Denied July 26, 2001.

Lewis B. Quigley, Salt Lake City, for plaintiff.

Reed L. Martineau, Rex E. Madsen, Keith A. Call, Salt Lake City, for The Estate of Otto F. Therkelsen.

Mark Dalton Dunn, Salt Lake City, for Steven A. Ness.

DURRANT, Justice:

¶ 1 On the evening of November 8, 1997, Otto Therkelsen, Jr., shot Steven A. Ness with a 9–millimeter semi-automatic handgun. Immediately afterward, he shot and killed his wife, Linda Therkelsen, and then fatally shot himself. Ness survived. He filed a complaint against Otto Therkelsen's estate, alleging both battery and negligence in the shooting. The estate tendered the defense of the lawsuit to Fire Insurance Exchange, which had issued a homeowners policy to Therkelsen. Fire Insurance then filed a complaint against the estate and Ness seeking a declaratory judgment regarding its obligation to defend and, ultimately, indemnify the estate. Fire Insurance argued that the facts related to the shooting did not support a claim for negligence, and, therefore, it should not be required to defend or indemnify the estate. The trial court agreed and granted summary judgment to Fire Insurance. The estate appeals.[1]

## BACKGROUND

¶ 2 "In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.... We state the facts in this case accordingly." *Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599 (citations omitted).

¶ 3 Ness met Linda Therkelsen at a bowling league in the fall of 1996. At the time, Linda and Otto Therkelsen were married. Ness and Linda became friends, and their relationship evolved into an intimate affair by the summer of 1997. Linda filed for divorce in October 1997 and also obtained a protective order against her husband. At some point in the Therkelsens' marriage, Therkelsen had told his wife that if she ever divorced him he would kill her and himself. After filing for divorce, Linda became concerned for her and her husband's safety, so she asked her son, Kendall, to remove the guns from the Therkelsens' house.

¶ 4 Shortly after filing for divorce, Linda began moving into Ness's home. She continued to work at her house during the day.

Otto Therkelsen had apparently moved out of the house and was staying in a room above his business, Otto's Auto and Marine. He wrote several letters to his wife in an attempt to reconcile the relationship, but to no avail.

¶ 5 At about 6:00 p.m. on November 8, 1997, Otto Therkelsen purchased a 9–millimeter semi-automatic handgun from Doug's Shoot'n Sports. Less than an hour later, Therkelsen appeared at Ness's doorstep. Ness answered the door, and Therkelsen told him he wanted to see Linda. Therkelsen attempted to enter but Ness pushed him back, telling him that he would ask her if she wanted to talk to him. Therkelsen pulled out the gun and told Ness, "You don't understand, I want to talk to her right now. You've been f* * *ing with the wrong guy." Ness yelled into the house, "Otto's here, and he's got a gun." Therkelsen forced Ness up the short flight of stairs near the entryway of the split level home. He pushed Ness down a hallway past a bathroom where Linda was. He grabbed his wife out of the bathroom and forced her and Ness into the master bedroom.

¶ 6 Linda pled with her husband "not to do this." Ness asked him, "Do you want to go to jail?" Therkelsen raised the gun in Ness's direction "and said something about his [Therkelsen's] life being over." The gun fired, hitting Ness in the right hand and shoulder, and Ness fell back behind the bed. Otto and Linda Therkelsen left the master bedroom. Ness grabbed a telephone and dialed 911. He heard shouting in the hallway, followed by two gunshots. Therkelsen then reentered the bedroom with his head down, attempting to insert a shell into the firing chamber of the newly-purchased handgun. Ness grabbed a .22 handgun that was under the bed and pointed it at Therkelsen. He pulled the trigger but nothing happened as the gun was not loaded. Therkelsen then looked over at Ness, who was still pointing the empty gun at him. Ness told him to leave or he would kill him. Therkelsen walked out of the room, and Ness heard another gunshot.

1. Though a defendant below, Ness did not join the estate in this appeal.

¶ 7 When police arrived at the scene, they found the Therkelsens dead, Otto from a self-inflicted gunshot wound and Linda from wounds in the face and chest. Ness was taken to the hospital.

¶ 8 At the time of the shooting, Therkelsen held a homeowners insurance policy issued by Fire Insurance. The policy stated Fire Insurance would "pay those damages which an *insured* becomes legally obligated to pay because of *bodily injury* or *property damage* resulting from an *occurrence* to which this coverage applies." The policy defined an "occurrence" as an "accident." The policy also specifically excluded from coverage "*bodily injury* or *property damage* which: ... is either ... caused intentionally by or at the direction of an *insured;* or ... results from any *occurrence* caused by an intentional act of any *insured* where the results are reasonably foreseeable."

¶ 9 Ness filed suit against Therkelsen's estate alleging both negligence and battery. In the allegation for negligence, Ness stated that Therkelsen "apparently did not know how to operate his gun" and "may have been simply attempting to frighten [Ness] and negligently fired his gun in the direction of [Ness]." The estate tendered the defense of the action to Fire Insurance, arguing that the negligence claim, if proven, could be covered under the homeowners policy as an "occurrence." Fire Insurance agreed to provide a defense, but also filed a reservation of rights.

¶ 10 After deposing Ness and Detective Mark Chidester, the homicide detective assigned to investigate the case, Fire Insurance concluded the shooting was intentional, taking it outside the homeowners policy's potential scope of coverage. Accordingly, Fire Insurance filed a complaint against the estate and Ness seeking a judgment declaring that it was no longer obligated to provide the estate with a defense in Ness's action and that it had no duty to indemnify the estate in that action.[2] Fire Insurance presented the depositions of Ness and Chidester as evidence that the shooting could not have been an "occurrence" under the homeowners policy. The estate argued that the trial court

should only consider the allegations in the complaint in the underlying action to determine Fire Insurance's duty to defend and that the depositions, even if considered, did not remove Fire Insurance's duty to defend or indemnify the estate. Fire Insurance then filed a motion for summary judgment, which the trial court granted. The estate appeals.

## DISCUSSION

■ ¶ 11 The issue before us is whether the trial court erred in granting Fire Insurance's motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "We review the trial court's summary judgment ruling[ ] for correctness." *Sur. Underwriters v. E & C Trucking,* 2000 UT 71, ¶ 14, 10 P.3d 338.

¶ 12 The trial court determined Therkelsen's shooting of Ness did "not constitute an 'occurrence' under the Fire Insurance Exchange policy, and that the shooting incident [was] excluded as an intentional act under the Fire Insurance Exchange policy." Therefore, the trial court held Fire Insurance has no duty to either defend or indemnify the estate in the pending, underlying action.

¶ 13 On appeal, the estate contends the evidence was insufficient to eliminate Fire Insurance's potential duty to indemnify the estate in the underlying action. Further, the estate contends that, in determining whether Fire Insurance has a duty to defend the estate in the underlying action, the trial court's consideration of extrinsic evidence, i.e., evidence adduced during discovery in the underlying action, was error. Alternatively, the estate argues that even if the trial court properly considered this extrinsic evidence, the evidence was insufficient to negate Fire Insurance's duty to defend the estate in the underlying action. We affirm the trial

2. Ness's underlying action was stayed pending the outcome of the declaratory judgment action.

court's determination that Fire Insurance has no duty to indemnify the estate in the underlying action. However, we conclude the trial court did not have a sufficient basis to determine whether Fire Insurance has a duty to defend the estate in the underlying action.

## I. THE DUTY TO INDEMNIFY

¶ 14 We first address the issue of whether the trial court properly granted Fire Insurance's motion for summary judgment as it relates to the potential duty to indemnify the estate in the underlying action. The duty to indemnify is a contractual one, and, accordingly, the issue at hand is governed by the terms of the parties' contract, i.e., Therkelsen's homeowners policy.

¶ 15 As it relates to the duty to indemnify, the policy provides that Fire Insurance will "pay those damages which an insured becomes legally obligated to pay because of *bodily injury* . . . resulting from an *occurrence* to which this coverage applies." The policy defines an "occurrence" as an "accident," but did not define the term "accident." Accordingly, we turn to our case law to define the term:

> the word [accident] is descriptive of means which produce effects which are not their natural and probable consequences. . . . An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds.

*Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 13, 983 P.2d 575 (alteration in original) (quoting *Richards v. Standard Accident Ins. Co.*, 58 Utah 622, 636, 200 P. 1017, 1023 (1921)). The policy also specifically excludes from coverage "*bodily injury* . . . which: . . . is either . . . caused intentionally by or at the direction of an *insured;* or . . . results from any *occurrence* caused by an intentional act of any *insured* where the results are reasonably foreseeable."

¶ 16 The trial court determined Therkelsen's shooting of Ness did "not constitute an 'occurrence' under the Fire Insurance Exchange policy, and that the shooting incident [was] excluded as an intentional act under the Fire Insurance Exchange policy." On appeal, the estate contends summary judgment was inappropriate as there were genuine issues of material fact as to whether the shooting was an "occurrence" and as to whether it was excluded from coverage as an "intentional act." We disagree.

¶ 17 Therkelsen entered Ness's home at gunpoint and forced Ness and Linda into the master bedroom while he fumbled with the gun in an effort to insert a live round into the firing chamber. Immediately before the shooting, Therkelsen stood only six feet away from Ness. While Linda Therkelsen pled with her husband "not to do this," Ness asked him, "Do you want to go to jail?" Therkelsen then raised the loaded gun in Ness's direction "and said something about his [Therkelsen's] life being over." The gun fired, hitting Ness in the right hand and shoulder, and Ness fell back behind the bed. These facts are undisputed.

¶ 18 Therkelsen's actions, entering the home at gunpoint, loading the handgun, and pointing it toward Ness, all demonstrate an intentional shooting. Further, Therkelsen's statement about his life being over demonstrates his lack of concern for the consequences of his actions. We conclude Therkelsen's actions, coupled with his statement to Ness, demonstrate the shooting was not an "accident" within the terms of the homeowners policy. Rather, it was the natural and probable consequence of Therkelsen's actions.

¶ 19 The estate has failed to present any evidence to rebut this conclusion. *See, e.g., Badger v. Brooklyn Canal Co.*, 922 P.2d 745, 752 (Utah 1996) (stating that once " 'a motion for summary judgment is made *and supported,*' " the party opposing the "motion must 'set forth specific facts showing that there is a genuine issue for trial' ") (quoting Utah R. Civ. P. 56(e)). The estate points only to the evidence that Therkelsen was fumbling with the handgun while attempting to load it. This evidence, when viewed in the

light most favorable to the estate, *see Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599, tends to demonstrate that Therkelsen did not know how to load the handgun properly when he shot Ness, his wife, and himself. However, this does not make the shooting of Ness accidental, as it is equally clear that Therkelsen's confusion related solely to his attempts to insert a live round in the handgun's firing chamber and not to the process by which the gun was actually fired. Accordingly, the trial court did not err in granting Fire Insurance's motion for summary judgment relating to the duty to indemnify the estate.

## II. THE DUTY TO DEFEND

¶ 20 We now turn to the separate issue of whether the trial court erred in concluding Fire Insurance has no duty to defend the estate in the underlying action. In determining whether Fire Insurance has a duty to defend the estate in the underlying action, the trial court considered deposition testimony from Ness and Detective Chidester, as well as Ness's statement given to Detective Chidester shortly after the shooting. The estate argues the trial court should have relied solely on the allegations of Ness's complaint in the underlying action to determine the issue. Alternatively, the estate contends, even if the trial court properly considered extrinsic evidence, the evidence was insufficient to negate Fire Insurance's duty to defend. Based on the record before us, we are unable to determine whether the trial court reached the proper conclusion in allowing extrinsic evidence to determine whether Fire Insurance has a duty to defend the estate.

¶ 21 Throughout the United States, "[a]s a general rule, an insurer's duty to

defend is determined by comparing the language of the insurance policy with the allegations in the complaint." 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 200:18 (3d ed.1999).[3] We have followed this rule in several cases. *See Nova Cas. Co. v. Able Constr., Inc.,* 1999 UT 69, ¶ 8, 983 P.2d 575 (stating that "[a]n insurer's duty to defend is determined by reference to the allegations in the underlying complaint"); *Sharon Steel v. Aetna Cas. & Sur.,* 931 P.2d 127, 133 (Utah 1997) (noting that the duty to defend "is determined by referring to the allegations in the underlying complaint"); *Deseret Fed. Sav. & Loan Ass'n v. United States Fid. & Guar. Co.,* 714 P.2d 1143, 1147 (Utah 1986) (comparing the allegations of the complaint with the terms of the insurance policy); *see also Simmons v. Farmers Ins. Group,* 877 P.2d 1255, 1258 n. 3 (Utah Ct. App.1994) (stating that "[g]enerally, insurers have a duty to defend any complaint alleging facts which, if proven, would render the insurer liable for indemnification of its insured"). However, this does not end our inquiry.

¶ 22 The general rule is based on the proposition that "an insurer's duty to defend is broader than its duty to indemnify." *Sharon Steel,* 931 P.2d at 133. In other words, an insurer may have a duty to defend an insured even if, as here, the insurer is ultimately not liable to indemnify the insured. However, as " '[t]he duty to defend arises solely under contract,' " *id.* at 141 (quoting *Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212, 1224–25 (6th Cir.1980)), the accuracy of this proposition hinges on the particular contractual terms of the insurance policy defining the scope of the duty to defend and the duty to indemnify.

---

3. *See also, e.g., Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 615 (Colo.1999) ("[T]he duty to defend is determined by looking at the allegations of the underlying complaint against the insured."); *Cmty. Action for Greater Middlesex County, Inc. v. Am. Alliance Ins. Co.,* 254 Conn. 387, 757 A.2d 1074, 1081 (2000) (holding that "the insurer's duty to defend is measured by the allegations of the complaint"); *Continental Cas. Co. v. Alexis I. duPont Sch. Dist.,* 317 A.2d 101, 103 (Del.1974) ("The test is whether the complaint alleges a risk within the coverage of the policy."); *State Farm Fire & Cas. Co. v. CTC Dev.*

*Corp.,* 720 So.2d 1072, 1077 n. 3 (Fla.1998) ("The duty to indemnify is determined by the underlying facts of the case, ... whereas the duty to defend is controlled by the allegations in the complaint against the insured."); *Loftin v. United States Fire Ins. Co.,* 106 Ga.App. 287, 127 S.E.2d 53, 58 (1962) ("[T]he duty to defend is determined by the contract; and since the contract obligates the insurer to defend claims asserting liability under the policy, even if groundless, the allegations of the complaint [against the insured] are looked to to determine whether a liability covered by the policy is asserted.").

¶ 23 For instance, on the one hand, homeowners policies commonly create "a contractual duty [of an insurer] to defend its insured against lawsuits by third-parties alleging liability within the coverage afforded by the policy. The liability coverage in a standard homeowners policy provides that the insurer will 'provide a defense at [the insurer's] expense by counsel of [the insurer's] choice, even if the suit is groundless, false or fraudulent.'" Douglas R. Richmond, 35 San Diego L.Rev. 457, 459 (1998) (first brackets added) (footnotes omitted). In such a case, "[t]he duty to indemnify [would be] determined by the underlying facts of the case, [while] the duty to defend [would be] controlled by the allegations in the complaint against the insured." *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1077 n. 3 (Fla.1998). In this sense, the "insurer's duty to defend is broader than its duty to indemnify." *Sharon Steel*, 931 P.2d at 133. Under such a policy, a determination of the duty to defend based on the allegations in the complaint, pursuant to the majority rule, accurately reflects the terms of the parties' contractual agreement.[4] Indeed, in such a case it would be error for the trial court to consider extrinsic evidence, as it is wholly irrelevant to the issue of whether the insurer has a duty to defend its insured.[5]

¶ 24 On the other hand, in *Fire Insurance Exchange v. Rosenberg*, 930 P.2d 1202 (Utah Ct.App.1997), the court of appeals had before it an insurance policy that described the duty to defend as follows: "At our expense and with attorneys of our choice, we will defend an *insured* against any covered claim or suit." *Id.* at 1203. In such a case, it would be appropriate for the trial court to consider extrinsic evidence, otherwise it would be unable to determine whether the claim or suit was "covered" by the policy.

¶ 25 As the examples above illustrate, whether extrinsic evidence is admissible to determine whether an insurer has a duty to defend an insured turns on the parties' contractual terms. If the parties make the duty to defend dependent on the *allegations* against the insured, extrinsic evidence is irrelevant to a determination of whether a duty to defend exists. However, if, for example, the parties make the duty to defend dependent on whether there is actually a "covered claim or suit," extrinsic evidence would be relevant to a determination of whether a duty to defend exists.

¶ 26 Based on these principles, a proper review of the trial court's decision in this case, i.e., that extrinsic evidence was an appropriate consideration in determining Fire Insurance has no duty to defend the estate in Ness's underlying action, necessarily hinges on the contractual terms giving rise to the duty to defend. However, neither party has shown that it presented any contractual provisions relating to the duty to defend to either this court or the trial court. Instead, the parties cite to the terms of Therkelsen's homeowners policy governing the duty to indemnify. Yet, as noted above, the duty to indemnify is not necessarily coextensive with the duty to defend. Indeed, generally, "an insurer's duty to defend is broader than its duty to indemnify." *Sharon Steel*, 931 P.2d at 133. Accordingly, as the contractual provisions relating to the duty to defend are not before us, we cannot determine whether Fire Insurance has a duty to defend the estate in the underlying action. Further, as the trial court did not have these provisions before it either, it could not properly determine whether Fire Insurance has a duty to defend the estate in the underlying action. Therefore, we are unable to reach the issue of whether the extrinsic evidence was sufficient to negate the duty to defend. Instead, we remand this issue to the trial court to determine whether Fire Insurance has a duty to defend the estate based on the actual contractual terms of Therkelsens' homeowners policy.

---

4. . We recognize the apparent inconsistency in determining that an insurer may have a duty to defend an insured although it does not have a duty to indemnify the insured. However, this result is proper where the duty to defend extends, by virtue of contract, to frivolous, i.e., groundless, false, or fraudulent, lawsuits.

5. This same test would be used if the insurance policy established, without defining the scope of, a duty to defend because any ambiguities would be construed in favor of the insured.

## CONCLUSION

¶ 27 We reverse the trial court's ruling granting Fire Insurance's motion for summary judgment as it relates to the duty to defend. We remand this issue for reconsideration consistent with this opinion. We affirm that part of the trial court's ruling determining Fire Insurance has no duty to indemnify the estate in the underlying action.

¶ 28 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.