FILED
United States Court of Appeals
Tenth Circuit

October 20, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

HEADWATERS RESOURCES, INC.,

Plaintiff - Appellant,

v.

No. 13-4035

ILLINOIS UNION INSURANCE
COMPANY and ACE AMERICAN
INSURANCE COMPANY,

Defendants - Appellees.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:09-CV-01079-DN)**

_____

Thomas V. Alleman, Cox Smith Matthews Incorporated, Dallas, Texas, (Bruce A. Maak, Jeffrey D. Stevens, Bryan Johansen of Parr Gee & Loveless, Salt Lake City, Utah with him on the briefs) for Appellant.

William F. Knowles, Cozen O'Connor, Seattle, Washington, (Scott M. Lilja, Van Cott, Bragley, Cornwall & McCarthy, Salt Lake City, Utah, with him on the brief) for Appellee.

_____

Before **LUCERO**, **TYMKOVICH**, and **BACHARACH**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Headwaters Resources, Inc. carried commercial liability insurance issued by two insurance companies, Illinois Union Insurance Company and ACE American Insurance Company. Under several applicable policies, Headwaters sought reimbursement for its litigation costs arising from a case brought by landowners in Virginia, alleging that Headwaters had caused personal injury and property damage during the construction of a nearby golf course. The complaint alleged that fly ash used in the construction process caused air and water pollution that devalued their homes and created health risks to the homeowners. The insurance companies told Headwaters that defense costs related to Headwaters' pollution were outside the scope of the coverage and denied the claim. As a result, Headwaters sued, and the district court eventually granted summary judgment in favor of the insurance companies, finding that the pollution exclusions in the insurance policies precluded coverage.

Since the 1970's, the extent to which pollution exclusions apply to preclude coverage in commercial general liability (CGL) policies has been a ubiquitous feature of insurance litigation. Generally speaking, jurisdictions that have addressed the scope of the "total pollution exclusion" fall into one of two camps: (1) courts that apply the pollution exclusions as written because they find them clear and unmistakable; and (2) courts that narrow the exclusions to "traditional environmental pollution," often because they find the terms of the exclusion to be ambiguous due to their broad applicability.

The Utah Supreme Court has not yet weighed in on this debate, and the district court did not pick a side on its behalf. Instead, the district court found that certain of the at-issue pollution exclusions unambiguously applied to bar coverage and that the remaining pollution exclusions, although possibly ambiguous, still applied because the complaints unquestionably alleged traditional environmental pollution. As a result, the complaints triggered the pollution exclusions in all of the policies, and the district court granted summary judgment in favor of the insurance companies.

Exercising jurisdiction under 28 U.S.C. § 1291, we find that each of the pollution exclusions is unambiguous, and AFFIRM the district court's grant of summary judgment.

## I. Background

### A. Underlying Lawsuits

Over 400 current and former residents of Chesapeake, Virginia, filed two separate lawsuits (together, the Chesapeake litigation) in Virginia state court, alleging property damage and bodily injury sustained due to pollution generated in connection with the development of a golf course. Headwaters Resources, Inc. and VFL Technology Corp. (collectively, Headwaters) were named as defendants in the Chesapeake litigation.

In the complaints, plaintiffs alleged that between 2002 and 2007 the defendants used 1.5 million tons of toxic fly ash, during construction of a golf

course at the Fentress site in Chesapeake.[1]  They broadly assert property damage and personal injury resulting from discharge and dispersal of the fly ash and its byproducts, which contaminated ground water, surface water, and air.  According to plaintiffs, the defendant entities systematically transported the fly ash to an open pit adjacent to residential neighborhoods.  The complaints allege that chemicals from the fly ash soon leached into the ground water, damaging the private wells that the communities relied on for drinking water.  In addition, the fly ash pit released airborne contaminants that wafted toward the neighborhoods and produced a strong smell of ammonia.  As a result of this alleged contamination, the property values of plaintiffs' homes depreciated and members of the community faced increased risk of serious bodily injuries caused by exposure to the fly ash and its attendant toxins.

Two complaints are at issue here—the Sears Complaint and the Fentress Complaint.  Both were filed in 2009 and "although the cases [were] not formally consolidated . . . they [were] dealt with together concerning all pre-trial proceedings for purposes of judicial efficiency."  *Fentress Families Trust v. Va. Elec. & Power Co.*, 81 Va. Cir. 67, 2010 WL 7765113, at *1 (2010).  The complaints allege in general:

---

[1]  The term "fly ash" embodies a particularized subset of coal ash. Both coal ash and fly ash refer to the ash waste produced during the combustion of coal.  Construction companies, including Headwaters, frequently use fly ash, often combined with binding agents or other substances, as structural fill material on large-scale construction projects.

As a result of the coal ash [and binding agent] discharge, Plaintiffs are seeking damages for losses to real and personal property, personal injuries, loss of quality of life, economic loss due to business disruption, out-of-pocket expenses, and medical monitoring of their exposure to toxic compounds in coal ash [and binding agent] and potential health effects that may result. Plaintiffs also seek injunctive relief ordering a complete removal of the coal ash [and binding agent] from the Fentress Site and from surface waters and land adjoining their property, cleaning the aquifers, monitoring the air, soil and water in their neighborhoods for the toxic components of coal ash [and binding agent] from the Fentress Site.

*See* App. Vol. IV at 793 (Fentress Complaint); App. Vol. VII at 1512 (Sears Complaint) (bracketed portions added in Sears Complaint).

### B. *Insurance Policies*

Beginning in 2002, Headwaters was insured under seven CGL insurance policies issued by Illinois Union Insurance Company and ACE American Insurance Company (collectively, ACE). Under each policy, ACE was required to reimburse Headwaters for expenses associated with lawsuits that occurred during the policy period. In particular, the provisions provided coverage for expenses incurred in connection with the defense of a suit in which damages due to "bodily injury" or "property damage" to which the policies apply "are alleged." *See, e.g.*, App. Vol. II at 295.

But the policies had exclusions for injuries caused by pollution. And within the pollution exclusions, each policy contained definitions of "pollution"

and "pollutants" that prescribe the circumstances under which the exclusions apply to bar coverage.

Once the Chesapeake litigation commenced, Headwaters looked to ACE for reimbursement of the cost of defending the lawsuits. After its investigation, ACE concluded that the policies did not cover the claims because the events giving rise to those claims fell within the pollution exclusions. For this reason, ACE denied Headwaters' insurance claim.

### C. Procedural History

After ACE's denial of coverage, Headwaters filed a complaint against ACE American and Illinois Union in federal court in Utah—Headwaters' principal place of business and the location where ACE delivered the insurance policies—alleging breach of the insurance contracts and bad faith in denying coverage for the Chesapeake litigation.

ACE moved for summary judgment, arguing that the pollution exclusions expressly precluded coverage. Headwaters responded with its own cross-motion for partial summary judgment. The district court agreed with ACE, finding that, under the 2003 and 2006 policies, the pollution exclusions unambiguously applied to bar coverage. On the remaining policies, the district court found that a determination on the ambiguity of the pollution exclusions was unnecessary because "[w]hatever else they may arguable [sic] reach, the 'pollution' exclusions clearly and unmistakably communicate that the [policies] do not provide coverage

-6-

for traditional environmental pollution," which the Fentress Complaint and the Sears Complaint alleged. *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 913 F. Supp. 2d 1210, 1220 (D. Utah 2012). The court later denied Headwaters' motion to alter or amend the judgment under Rule 59 of the Federal Rules of Civil Procedure.

## II. Analysis

Headwaters claims the district court erred in several ways. Taken as a whole, however, Headwaters' primary contention is that the district court recognized but failed to appreciate the effect of ambiguities in each policy's pollution exclusion and definitions. According to Headwaters, those ambiguities preclude granting summary judgment in favor of ACE. Based on our review, we disagree with Headwaters' premise because the pollution exclusions are not ambiguous and the underlying complaints plainly allege pollution caused plaintiffs' injuries.

### A. Application of the Pollution Exclusions

Headwaters first contends the pollution exclusions are ambiguous and it is entitled to a trial to determine the scope of ACE's duty to defend and provide indemnification of any losses associated with the Chesapeake litigation.

#### 1. Legal Framework

In this diversity action, we apply Utah law. *Houston Gen. Ins. Co. v. Am. Fence Co.*, 115 F.3d 805, 806 (10th Cir. 1997) ("The interpretation of an

insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state.").  Under Utah law, the insurer has a duty to defend claims that arguably fall within the scope of the coverage provided.  *Equine Assisted Growth and Learning Ass'n v. Carolina Cas. Ins. Co.*, 266 P.3d 733, 736 (Utah 2011); *see also Fire Ins. Exch. v. Therkelsen*, 27 P.3d 555, 560 (Utah 2001) ("The test is whether the complaint alleges a risk within the coverage of the policy." (internal citation omitted)).

In duty-to-defend cases, Utah applies the so-called "eight corners rule." *See, e.g.*, *Basic Research, LLC v. Admiral Ins. Co.*, 297 P.3d 578, 580 (Utah 2013).  Under the eight corners rule, an insurer's coverage liability is determined by comparing the allegations within the four corners of the complaint to the language contained in the four corners of the insurance policy.  *Id.*[2]  On this basis, the duty to defend "is triggered when the allegations in the underlying complaint[,] if proved, could result in liability under the policy."  *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1236 (D. Utah 2013) (internal quotation marks omitted).  But "[i]f the language found within the collective 'eight corners' of these documents clearly and unambiguously indicates that a duty to defend does or does not exist, the analysis is complete."  *Equine Assisted*

---

[2]  By contrast, under some insurance policies, it is necessary to consult the objective facts underlying the complaint to determine whether coverage is warranted.  *Equine Assisted Growth*, 266 P.3d at 736.  But where, as here, the policy defines the scope of coverage with specific reference to the allegations in the complaint, the eight corners rule controls.  *See id.*

*Growth*, 266 P.3d at 737. It is the insurance company's burden to "demonstrate that none of the allegations of the underlying claim is potentially covered (or that a policy exclusion conclusively applies to exclude all potential for such coverage)." *Cincinnati Ins. Co.*, 921 F. Supp. 2d at 1236–37.

Examining the four corners of the insurance policy is a matter of contract interpretation because an insurance policy is "merely a contract between the insured and the insurer." *Alf v. State Farm Fire and Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). Like other contracts, an insurance policy is interpreted to give effect to the intent of the parties as expressed by the plain language of the instrument itself. *Id.* The insurer is permitted to limit or modify its obligations to provide coverage through explicit exclusions and exclusionary language. *See Pollard v. Truck Ins. Exch.*, 26 P.3d 868, 871 (Utah 2001). But to limit coverage in this way the insurer must set forth exclusions "using language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Alf*, 850 P.2d at 1275 (internal quotation marks omitted).

The policies do not require a *per se* duty to defend. Rather, they provide for reimbursement of various expenses that Headwaters incurs in connection with the defense of lawsuits in which bodily injury or property damage within the scope of coverage "are alleged." *See, e.g.*, App. Vol. II at 371–77. Under this so-called "allocated loss adjustment expenses" provision, ACE could, but was not

obligated to, assume from Headwaters the defense or control of any *covered* suit filed against Headwaters. If ACE chose not to defend, then it would reimburse Headwaters for all reasonable and necessary expenses in excess of a minimum retention amount. Irrespective of its classification, this duty is one to which the eight corners rule applies. *Cf. Equine Assisted Growth*, 266 P.3d at 735–36 (describing the circumstances under which the eight corners rule operates).

When an insurance policy, including its exclusions and limitations, is unambiguous, a court is restricted from considering extrinsic evidence to determine the parties' intent.[3] *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983) ("Whether an ambiguity exists is a question of law to be decided before parol evidence may be admitted."); *see also Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1171–72 (10th Cir. 2010) (collecting cases under Utah law that show the prohibition on extrinsic evidence in duty-to-defend cases that are based on the allegations in the complaint). On the other hand, when a policy provision is ambiguous, extrinsic evidence is admissible to help "resolve the ambiguity." *Fire Ins. Exch. v. Oltmanns*, 285 P.3d 802, 805 (Utah 2012); *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 583 (Utah

---

[3] In its reply brief, Headwaters also contends that Utah law allows extrinsic evidence to determine *whether* a latent ambiguity exists in the first instance. *See* Aplt. Reply at 21–22 (citing *Watkins v. Ford*, 304 P.3d 841 (Utah 2013)). But Headwaters argued in its opening brief that extrinsic evidence was only admissible to *resolve* the policies' allegedly patent ambiguities, thus waiving the argument concerning a latent ambiguity that it makes on reply.

Ct. App. 1990) (defining ambiguity as an instance where "the terms used to express the intention of the parties may be understood to have two or more plausible meanings").  Similarly, when an insurance policy is less than clear to the reasonable purchaser of insurance, Utah courts consistently interpret "ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations [ ] in favor of coverage."  *U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 522 (Utah 1993).

But the identification of an ambiguity is a matter first for the court.  *Cf. Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 800–01 (Utah 2004) (finding ambiguities first, before construing the lack of clarity in favor of the insured).  In other words, *unless* the language is unclear, the general rule applies, and the court interprets the contract in accordance with the parties' intent as expressed by the plain language of the relevant instruments.  *See Holmes Dev., LLC v. Cook*, 48 P.3d 895, 902 (Utah 2002); *State Farm Mut. Auto. Ins. Co. v. DeHerrera*, 145 P.3d 1172, 1174 (Utah Ct. App. 2006).  And it is important to remember, a policy provision is not ambiguous simply because the parties ascribe different meanings to it according to their own interests.  *See Camp v. Deseret Mut. Benefit Ass'n*, 589 P.2d 780, 782 (Utah 1979).

With this legal background in mind, we turn next to the language of the pollution exclusions.

### 2. *Language of the Pollution Exclusions*

The various policies that insured Headwaters contain similar but not identical exclusionary language. Broadly stated, the pollution exclusions are forms of the "total pollution exclusion" that "[t]he majority of courts have held [to be] 'clear and unambiguous.'" *See* 9 Steven Plitt et al., *Couch on Ins.* § 127:13 (3d ed. 1995, database updated 2014).[4]

Headwaters, however, maintains that the comprehensiveness of the pollution exclusions reveals ambiguity within the policies because literal application of the exclusions abolishes coverage. But a plain reading of the exclusion provisions contradicts Headwaters' appeal for ambiguity. Simply stated, the pollution exclusions, while far-reaching, are not ambiguous and do not abolish all coverage under the policies. We reach this conclusion by first reviewing the various iterations of the pollution exclusions incorporated into the relevant policies.

### a. *The 2003 and 2006 Policies*

The 2003 and 2006 policies, which contain an identical pollution

---

[4] As a historical note, the "total pollution exclusion" within CGL policies has evolved over the past forty years as an effort by the insurance industry to limit its liability for the potentially large costs associated with environmental litigation. *See* Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 Va. L. Rev. 85, 104 (2001). Accordingly, there is no question that the standard-form pollution exclusions have aimed for the broad applicability that Headwaters challenges here. *Id.*

exclusion,[5] excise coverage for "bodily injury" and "property damage" that stems from "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'" when combined with at least one of five circumstances enumerated in lettered subparts. App. Vol. II at 283–84; App. Vol. III at 530.[6]

The district court held that the allegations in the complaint fell within subpart c of the pollution exclusion. That provision excludes coverage for bodily

---

[5] Before the district court, Headwaters argued that certain "endorsements" contained in the 2006 policy effectively deleted the pollution exclusion in its entirety. The district court disagreed, and Headwaters does not make the argument on appeal. *See* Aplt. Br. at 18–19. Accordingly, for our purposes the pollution exclusions for the 2003 and 2006 policies are the same.

[6] In relevant part, the exclusions take away coverage for:

> "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
> ***
>
> (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
>
> > (i) Any insured; or
> >
> > (ii) Any person or organization for whom you may be legally responsible; . . .
>
> ***

App. Vol. II at 283–84; App. Vol. III at 530.

injury or property damage caused by the dissemination of pollutants "[w]hich are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for: (i) [a]ny insured; or (ii) [a]ny person or organization for whom [the insured] may be legally responsible." *Id.* "Pollutants," under the 2003 and 2006 policies, are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." App. Vol. II at 295; App. Vol. III at 541.

### b. *The 2004, March 2005, and October 2005 Policies*

The 2004, March 2005, and October 2005 policies contain a differently worded pollution exclusion from the policies described above. These policies bar coverage for "any injury, damage, expense, cost, loss, claims, liability or legal obligation arising out of or in any way related to pollution, however caused." App. Vol. II at 344, 403, 464. Moreover, the definition of pollution includes the alleged presence or introduction into the environment of "(i.) any substance, if such substance has, or is alleged to have, the effect of making the environment impure, harmful, or dangerous, (ii.) hazardous substances, hazardous materials, (iii.) or any 'pollutant.'" *Id.* In turn, "Pollutant" is defined as,

> [A]ny solid, liquid, gaseous or thermal irritant or
> contaminant, including smoke, vapor, soot, fumes, acids,
> alkalis, chemicals and waste. Waste means any
> substance that: (a.) is left over, or no longer in use, or
> discarded; (b.) is to be reclaimed or recycled, or

-14-

reconditioned; (c.) has been removed, treated, stored or disposed of as part of any environmental remediation effort; or (d.) is animal or human waste.

App. Vol. II at 365–66, 424–25, 485–86.

### c. *The 2007 and 2008 Policies*

The pollution exclusions within the 2007 and 2008 policies adopt components of the definitions and provisions from the policies from the previous years. First, like the 2004 and 2005 policies, the 2007 and 2008 policies broadly exclude coverage for "pollution, however caused." App. Vol. III at 598, 697. In addition, the 2007 and 2008 policies define "pollution" in a way that is, for all relevant purposes, the same as the counterparts from the 2004 and 2005 policies. *Id.* Finally, the 2007 and 2008 policies embrace the definition of "pollutants" contained in the 2003 and 2006 policies. *See id.*

### 3. *The Chesapeake Complaints*

Before further discussing the language contained within the four corners of the policy provisions, we must also examine the precise nature and characteristics of the allegations within the four corners of the Chesapeake complaints.

The district court found that the "the complaints in the . . . lawsuits alleged bodily injury and property damage arising out of the actual or threatened dispersal of pollutants from waste that was processed by Headwaters." *Headwaters Res., Inc.*, 913 F. Supp. 2d at 1212. Taken broadly, the complaints allege pollution of the type that falls within the pollution exclusions in all the policies.

-15-

And after review, we agree with the district court that the Fentress

Complaint and the Sears Complaint allege causes of action that arise exclusively

on the basis of the polluting activities of Headwaters and its co-defendants. The

Fentress Complaint,[7] for example, asserts a number of pollution-based accusations

that comprise the gist of plaintiffs' claims:

- During a five-year period between 2002 and 2006, VFL and others "dumped 1.5 million tons of coal ash into an unlined pit at the Fentress Site . . . in the middle of the homes of over 300 people, all of which relied on the private wells for water." App. Vol. IV at 790.

- The coal ash seeped into "underground aquifers . . . thereby poisoning the residents' drinking and household water with . . . toxic coal ash." App. Vol. IV at 790.

- "The coal ash . . . contained toxic substances, including toxic metals and poisons, such as arsenic, lead, mercury, ammonia nitrates, chromium, beryllium, aluminum, zinc, thallium, boron, barium, and magnesium." App. Vol. IV at 791.

- Defendants' pollution "not only destroyed the market value of [Plaintiffs'] homes, but also exposed the Plaintiff homeowners [and others] to potentially devastating and serious bodily injuries known to be caused by, and result from ingestion and exposure to coal ash toxins, including, but not limited to injuries to pulmonary systems, gastrointestinal systems, reproductive systems, organs of the body and tissues, brain damage, and numerous developmental injuries unique to children . . . ." App. Vol. IV at 792.

---

[7] The Fentress Complaint and the Sears Complaint do not materially differ in their allegations. In their briefs, both parties treat the complaints as largely indistinguishable.

-16-

- "At the Fentress site, toxic coal ash was ever present. It would cover individuals at the site and the dump trucks. It would be taken up by the wind and deposited around the [adjacent communities]. Dump trucks would crush the coal ash on the road and it would fly up into the air." App. Vol. IV at 819.

- "The hazardous substances released from the facility were and are transported by wind, by groundwater, by migration into and through the aquifer and other natural processes onto and into the homes, properties, person, pets and livestock and other areas of the surrounding communities." App. Vol. IV at 824.

The extent of the pollution described in the underlying complaints cannot be reasonably disputed—in short, these allegations of Headwaters' polluting activities are the *sole* cause of plaintiffs' claimed injuries.

As we discuss below, the allegations, therefore, fall squarely within the pollution exclusions of the policies and under the eight corners rule they except from the scope of coverage the incidents of environmental pollution caused by the Chesapeake construction project.

### 4. Ambiguity

In the typical duty-to-defend case, we would next turn directly to the application of the eight corners rule to determine whether the policies unambiguously except from coverage the allegations of pollution chronicled in the complaints. But, as we alluded to above, Headwaters' call for ambiguity is not of the usual sort because Headwaters does *not* convincingly argue that the terms of the pollution exclusions are susceptible to multiple meanings, either

-17-

facially or when applied to the complaints from the Chesapeake litigation. Instead, Headwaters asserts that these provisions are fundamentally ambiguous in light of their breadth and raises several arguments urging a different result, all of which avoid the plain language of the pollution exclusions. And so, before applying the policy provisions to the facts alleged in the complaints as required under the eight corners rule, we address Headwaters' overarching argument of ambiguity.

First, Headwaters contends that the pollution exclusions are so broad that they bar from coverage events arising from Headwaters' "regular business activities" and use of its "products." *See* Aplt. Br. at 21 But we are not aware of any categorical rule that prohibits a normal business activity from also producing pollution, or a product from also being classified as a pollutant. *See Bituminous Cas. Corp. v. St. Clair Lime Co.*, 69 F.3d 547, at *4–5 (10th Cir. 1995) (unpublished table decision) ("There is no language in the policy to suggest that the insured's 'product,' as contemplated in the products-completed operations hazard coverage, could not be a 'pollutant.'"). Stated otherwise, euphemistically designating an activity or a material in a certain way does not necessarily insulate it from the force of a broad pollution exclusion. In the end, the fact that coverage may be excluded for regular business activities and projects does not shortcut our analysis, and we have frequently concluded that the routine commercial activities of the insured can occasion application of a CGL policy's pollution exclusion to

-18-

bar coverage under Utah law.  *See Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1528 (10th Cir. 1995); *Anaconda Minerals Co. v. Stoller Chem. Co.*, 990 F.2d 1175, 1178–79 (10th Cir. 1993); *Hartford Acc. & Indem. Co. v. U.S. Fid. & Guar. Co.*, 962 F.2d 1484, 1489 (10th Cir. 1992)[8]; *see also Great Lakes Container Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 727 F.2d 30, 33 (1st Cir. 1984); *Am. States Ins. Co. v. Nethery*, 79 F.3d 473, 477 (5th Cir. 1996) ("[N]umerous courts have found substances constituted pollutants regardless of their ordinariness or usefulness.").

Put another way, in light of our straightforward comparison of the policies and the complaints, no amount of semantic sleight-of-hand can transform the alleged pollution into something less pernicious.  Resisting this conclusion, Headwaters points to the unpublished district court case in *United National Insurance Co. v. International Petroleum & Exploration*, No. 2:04-CV-00631 (BSJ), 2007 WL 4561460 (D. Utah Dec. 20, 2007) (*IPE*), to argue that a broad exclusion on normal business practices generates ambiguity.  It is true that in *IPE* the court interpreted what it deemed an ambiguous policy exclusion applicable to the facts of that case to avoid excluding coverage for the insured's normal

---

[8] Headwaters rightly notes that these cases arose during a wave of litigation about the applicability of the "sudden and accidental" exception to the former standard version of a CGL pollution exclusion.  *See* Aplt. Reply at 11–12. But we nevertheless adopt the persuasive general principle from these decisions that a pollution exclusion itself can apply to the ordinary business activities of the insured.

business activities. *See id.* at *11. But to the extent that *IPE* found pollution exclusions similar to those at issue in this case to be ambiguous, we disagree, particularly as the exclusions apply to the allegations here. The fact that certain policy provisions, including pollution exclusions, may broadly apply to bar coverage does not make them ambiguous.

Further, at least one Utah decision suggests the converse of Headwaters' line of reasoning. *See Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 136 (Utah 1997). In *Sharon Steel*, the Supreme Court of Utah interpreted an exception to a pollution exclusion for "sudden and accidental" occurrences to be inapplicable to the "insured's normal course of operation." *Id.* In fact, the court indicated that

> [W]here incidents of pollution appear to be more like normal business activities, the costs of cleanup should be included in the normal cost of business by the insured. Furthermore, holding the industrial community liable for its pollution may be more likely to motivate industry to improve its practices and become safer and cleaner.

*Id.*

And while it is possible Headwaters' business might generate more pollution than the average CGL policy holder, we cannot sustain Headwaters' argument that it is deprived of coverage under ACE's CGL policy because pollution from its normal business activities is uncovered. In fact in examining the policies, they still cover foreseeable claims in myriad instances, such as the

typical lawsuit involving a pedestrian injured in a slip-and-fall on company property, claims for property damage caused when a piece of its machinery accidentally bursts a water main, or for numerous other fortuitous occurrences within the scope of its CGL coverage.[9] And of course, Headwaters can purchase additional special-purpose coverage for environmental pollution liability that provides more comprehensive coverage for the unique risks associated with its business model. *See* Abraham, *supra,* at 103–04.

Headwaters' ambiguity arguments are also unpersuasive inasmuch as they all amount to a veiled attempt to introduce extrinsic evidence to interpret an unambiguous contract.[10] *Therkelsen*, 27 P.3d at 561 (finding that in cases where the insurer's duty is based on the allegations in the complaint "extrinsic evidence . . . is wholly irrelevant"). Utah law does not grant a party the opportunity to reimagine a clear contract to suit its position, and we decline to do so here.

We also do not credit Headwaters' parade-of-horribles argument about the types of materials—*e.g.*, paint or dust or a frozen puddle of water—that might be considered pollutants under the broadly applicable pollution exclusions. To

---

[9] At oral argument, counsel for ACE represented that Headwaters had submitted, and ACE covered, other claims involving its products and regular business.

[10] Headwaters wants this court to consider ACE's knowledge of Headwaters' business operations, use of coal combustion products, and work at the Fentress site as evidence of the intended scope of coverage. *See* Aplt. Br. at 8–13. Simply stated, this information is immaterial extrinsic evidence.

diffuse this line of thinking, we need only consult the reasonable purchaser of insurance: would that individual interpret the unambiguous language of the exclusions to bar coverage for occurrences involving innocuous substances like water? *See Reg'l Bank of Colo., N.A. v. St. Paul Fire and Marine Ins. Co.*, 35 F.3d 494, 497 (10th Cir. 1994). We think not, and that fact alone is likely enough to distinguish those hypotheticals from the comprehensive pollution that the underlying plaintiffs allege in the complaints here, which the pollution exclusions unambiguously cover. To the same end, we are unconvinced that the substances in these hypotheticals would even qualify as "irritant[s] or contaminant[s]" or "substance[s] . . . [that have] . . . the effect of making the environment impure, harmful, or dangerous" under the plain language of the applicable policies.[11] In any event, those closer cases are not before us today, and we need not determine how the pollution exclusions here might apply to different allegations.

Headwaters' assertions of overarching ambiguity are not grounded in Utah law, and they ultimately do not bear on our clear-cut task under the eight corners rule. We thus turn back to the specifics of the pollution exclusion to consider whether they apply to bar coverage for the allegations from the Chesapeake litigation.

---

[11] Headwaters also contends the terms "irritant" and "contaminant" are independently ambiguous. We disagree. These terms have plain and unambiguous meanings, *see Church Mut. Ins. Co v. Clay Ctr. Christian Church*, 746 F.3d 375, 380–81 (8th Cir. 2014), even if those meanings are expansive.

### a. The 2003 and 2006 Policies

Pursuant to the definitions in the 2003 and 2006 policies, the "toxic substances" contained within the fly ash mixture clearly constitute pollutants. Since the fly ash, including its component parts and associated binding agents, is a "pollutant" under these policies, coverage is excluded as long as one of the subparts applies. As the district court held, the "pollutants that allegedly resulted in the Fentress and Sears plaintiffs' bodily injury and property damage were 'processed as waste[,]'" triggering subpart c of the pollution exclusion. *Headwaters Res., Inc.*, 913 F. Supp. 2d at 1217 (subpart c applies to "the pollutants that allegedly resulted in the Fentress and Sears plaintiffs' bodily injury and property damage"). Fly ash, regardless of its possible utility, is a coal combustion waste product according to the complaints. This is the case even when it is mixed with other substances. For this reason, when Headwaters and its co-defendants released the fly ash mixture, a pollutant, into the environment at the Fentress site, the pollution exclusion from the 2003 and 2006 policies forestalled coverage in the event of a lawsuit. Significantly, subpart c only requires that the pollutants were processed as waste "at any time"; thus, it was irrelevant whether the fly ash was still waste when it was dispersed at the Fentress site.

### b. The 2004, March 2005, October 2005, 2007, and 2008 Policies

Because of the broad definitions of "pollution" and "pollutants" in the remaining policies, it is clear that the allegations in the complaint properly invoke the pollution exclusions. For example, the complaints allege that the "coal ash [and binding agent] discharged . . . contains toxic substances" and that "airborne and waterborne releases at the Fentress Site have caused [] hidden carcinogens, poisons and hazardous substances inherent in coal ash [and binding agent] to spread from the facility to the surrounding communities in periodic waves driven by wind and water." *See* App. Vol. IV at 791, 824; App. Vol. VII at 1509, 1561. No ambiguity exists in the extent to which the exclusions apply because they bar coverage for the introduction into the environment of "any substance [that] has, or is alleged to have, the effect of making the environment impure, harmful, or dangerous." App. Vol. II at 344, 403, 464; App. Vol. III at 598, 697. In the alternative, the fact that the fly ash is considered "waste" under the definition of "pollutants" would also occasion the application of this exclusion.

Instead of relying on the plain language of the applicable exclusions in these policies, the district court sought to avoid the possibility that the broad pollution exclusions could "exclud[e] coverage for bodily injury or property damage not caused by a 'pollutant acting as a pollutant.'" *Headwaters Res., Inc.*, 913 F. Supp. 2d at 1220 (citing *IPE*, 2007 WL 4561460). In doing so, the district

court narrowly construed the provisions in these policies to cover only "traditional environmental pollution." *Id.* But the district court came to its conclusion without ever determining that the policies were ambiguous. While we agree that plaintiffs complain of "traditional environmental pollution" as that term is generally defined in other jurisdictions, *see generally Apana v. TIG Ins. Co.*, 574 F.3d 679, 682–83 (9th Cir. 2009) (collecting cases), we need not consider other scenarios given that the alleged facts in the complaint are resolved by unambiguous language. What is inescapable in this case is that the facts alleged exemplify the type of pollution that the pollution exclusions unambiguously describe and eliminate from the scope of coverage under the policies.

Notwithstanding its analysis regarding whether the complaints allege "traditional environmental pollution," the district court's initial conclusion that "[t]hese allegations place the [Chesapeake litigation] squarely within the exclusions for damages arising out of pollution found in the Remaining Policies," *Headwaters Res., Inc.*, 913 F. Supp. 2d at 1219, is the correct one. After finding no ambiguity in the remaining policies, the district court's work was done.

\*   \*   \*

In sum, the dispositive feature in this case—the feature Headwaters cannot rebut—is that the language of the pollution exclusions remains unmistakeably plain both on its face and as applied to these facts. And because that clear language applies to the causes of action alleged in the complaints, ACE was not

required to reimburse Headwaters for the costs associated with defending the Chesapeake lawsuits.

Accordingly, we agree with the district court that ACE was not liable to reimburse Headwaters for expenses incurred in connection with defending against the Fentress Complaint and the Sears Complaint.

### B. Good Faith

Headwaters also argues that ACE violated its duty of good faith. Under Utah law, the "obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). Where an insurance contract indicates that the scope of coverage is defined by the allegations in the underlying complaint, then the insurer's only obligation is to compare the complaint to the policy to determine whether the occurrence is covered. *Equine Assisted Growth*, 266 P.3d at 736. So, to meet its obligation of good faith, ACE in this case only needed to compare the allegations in the complaints to the policies and timely communicate to the insured its coverage decision. ACE fulfilled its obligation.

### C. Rule 59(e) Motion

Finally, Headwaters contends the district court should have granted its Rule 59 motion to revisit summary judgment. It argues the court grounded its ruling

on claims that the Virginia state court had dropped from that litigation. That court specifically dropped claims alleging that the leached materials had contaminated plaintiffs' ground water because the complaints lacked the factual specificity to establish the requisite causal link between the leaching and the injury under Virginia law. *See* App. Vol. XIV at 3546–53. Headwaters speculates, therefore, that the district court would have reached a different decision had it not considered the leachate claims in concluding the pollution exclusions applied.

We review a denial of a Rule 59 motion for abuse of discretion. *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1191 (10th Cir. 2014). "[A] trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997).

There was no abuse of discretion here. Headwaters claims the district court's "refusal to consider any claims other than those relating to the 'deleted' leachate claims meets the criteria" for a Rule 59 motion. *See* Aplt. Br. at 59. This argument suffers from both a procedural flaw and a substantive flaw. Procedurally, a Rule 59(e) motion "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

-27-

Headwaters could have raised during summary judgment proceedings the point that the leachate claims had been dropped from the Virginia state court litigation, but did not do so. We cannot fault the district court for concluding the argument was untimely and refusing to consider it in the context of Rule 59.

And from a substantive perspective, the district court specifically ruled that the new evidence or arguments from the state court litigation "would not change the outcome on the parties' summary judgment motions anyway - the court sees no distinction among pollution of the air, surface water, and ground water." *See* Docket Text Order, *Headwaters Res., Inc. v. Ill. Union Ins.*, No. 2:09-cv-01079-DN (D. Utah), ECF #120 (filed Feb. 14, 2013). The district court's point is clear: the widespread pollution alleged through the Chesapeake litigation was not contingent on the groundwater claims alone. *See supra* Part II.A.3. Accordingly, the pollution exclusions would be triggered even if the district court specifically excluded the leachate claims from the complaints.

Finally, it is worth reiterating that the district court considered the underlying complaints and the policies—the only documents necessary to rule on ACE's liability—in making its decision. Thus, no supplemental evidence or information, as a matter of law, could have influenced the district court's decision.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's disposition below.