2018 AUG 13 AM 10: 45


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GROUP HEALTH COOPERATIVE,
a Washington nonprofit corporation,

    Respondent,

    v.

NATHANIEL COON and LORI COON,
husband and wife,

    Appellants.

No. 76365-2-I

DIVISION ONE

PUBLISHED OPINION

FILED: August 13, 2018

LEACH, J. — Group Health Cooperative seeks reimbursement for health care benefits it provided to Nathaniel (Joel) and Lori Coon. The trial court determined on summary judgment that Group Health had an enforceable right to reimbursement from settlement funds obtained by the Coons. The Coons appeal from that decision. Because disputed factual issues prevent the resolution of Group Health's claims on summary judgment, we reverse and remand for further proceedings.

## FACTS

The parties do not dispute many underlying facts. Nathaniel Coon had knee surgery at the Everett Clinic (Clinic) in March 2012. After the surgery, he developed an aggressive infection in his leg that ultimately resulted in an above-the-knee amputation. The Coons' insurer, Group Health, paid approximately $372,000 in medical expenses for his treatment. In December 2013, an attorney for the Coons wrote to Group Health,

advising that he was representing the Coons in connection with a medical malpractice claim against the Everett Clinic for injuries he sustained from complications during the knee surgery procedure. He stated that the Clinic was disputing both negligence and causation. He requested that Group Health provide a breakdown of its "subrogation lien" for benefits it had paid relating to this claim. Group Health wrote back, including an itemized list of providers and expenses that had been covered. Group Health asked to be kept informed of settlement negotiations and to be contacted before final settlement "to confirm Group Health's subrogation amount."

The Clinic was unable to determine the cause of the infection, and the Coons likewise, despite considerable effort, could not identify a theory of negligence and causation that would support a malpractice lawsuit against the Clinic. The Clinic voluntarily paid the Coons over $300,000 to help with medical expenses, wage loss, travel and accommodation expenses (the amputation occurred out of state), and other expenses. The Clinic also asked the Coons to participate in mediation to resolve any claim by the Coons for additional compensation.

A declaration from attorney Todd Gardner, submitted to the trial court by the Coons, suggests a possible motivation for the mediation request:

> It appears that there were factors that motivated The Everett Clinic to enter into pre-litigation negotiations in this case that were not centered on traditional assessments of liability and damages. It appears from the correspondence I have reviewed, that The Everett Clinic targeted this case as the type of case they would try to resolve before litigation was

filed under a new program designed to reduce litigation filings and provide some level of compensation to patients who have suffered grievous injuries on their watch. This provided an opening for plaintiffs to mediate the claim with The Everett Clinic without the need for filing litigation.

Before the mediation, both the Coons' lawyer and the Clinic's lawyer sent letters to the mediator. Each provided background on Coon's injury and discussed that party's view of the case. The letter from Coons' counsel explained that no lawsuit had been filed: "this is an attempt at a pre-litigation resolution of the claim." The Clinic had "initiated the resolution effort":

> The Everett Clinic and its insurer initiated the resolution effort before I became involved. They have been very cooperative in helping Mr. and Mrs. Coon financially to deal with the consequences of his injury, including making monthly payments to help Mr. Coon hire people to assist in running his lawn care and landscaping business. The Coons very much appreciate that help.

Counsel went on to explain that he had not established a theory of liability:

> We have consulted with several liability experts, including an orthopedic surgeon, an orthopedic infectious disease expert, a hospital-infection expert, and an expert in operating room construction and ventilation systems. . . . I also had an extensive telephone conference with Dr. Robert Trousdale, the orthopedic surgeon most closely involved with Joel's care at the Mayo Clinic [where the amputation occurred]. At this point, we have several hypothetical theories about how the fungal infection was acquired by Joel. However, without extensive discovery we are not able to pin-point a specific explanation of how this happened. Basically, at this point we have a *res ipsa loquitur* case.

According to the letter, Dr. Trousdale had suggested a possible liability theory, that fungal spores were tracked into the operating room "by a provider, possibly on the sole of a shoe." Dr. Trousdale "said that this kind of fungal infection would not ordinarily

occur if appropriate sterile techniques and procedures were followed and the positive pressure ventilation system was designed and operating properly."

The letter described how Coon's amputation had impacted him and his family. The injury interfered with Coon's ability to operate his business and engage in the outdoor activities he had previously enjoyed. His claimed damages included $2 million in future care costs and $7 million in future economic loss. The letter made this statement about noneconomic damages: "Joel and Lori would present very well to a jury, and I have no doubt that any award for the non-economic impact of this injury would be for many millions of dollars."

The letter from the Clinic's counsel explained that the fungal infection acquired by Coon was "extremely rare, aggressive, and resistant to most known and FDA-approved antifungal agents." After an "extensive review," the Clinic was still "unable to find a definite source or cause" of Coon's infection. As part of its review, the Clinic had consulted with experts who determined that the doctors who performed Coon's surgery met or exceeded the standard of care. The Clinic had determined it was "unlikely" that the infection was caused by conditions in the operating room.

In view of the fact that neither the Clinic nor the Coons could determine what caused the infection, the Clinic's lawyer suggested that the Coons would face difficulty proving liability:

The parties have agreed to mediation in the hope of reaching a final settlement without the need for litigation. TEC [the Everett Clinic], however, is concerned that the Coons' expectations for settlement may not prove to be realistic. TEC believes that the Coons may not fully appreciate the difficulty they face in trying to prove, to a reasonable degree of medical probability, how the infection occurred, its source or cause, or what, if any, specific precautions that allegedly should have been taken but were not taken would have prevented the infection from occurring. The damages the Coons are seeking should be significantly discounted to account for the difficulties of proof of liability and causation that they face.

. . . .

Given the difficulty in identifying, more probably than not, the source of the SP [Scedisporium prolificans] spores, it is also difficult to establish more probably than not that any additional precautions could have been taken (that should have been taken) that would have prevented Mr. Coon's SP infection. The simple fact remains that this exceedingly rare SP infection is so highly resistant to most, if not all, readily available anti-fungal agents that it is unlikely that any customarily-employed infection control procedure would have killed the SP and prevented the infection.

Counsel described the Coons' estimated damages as "over-inflated." The Clinic was "not prepared to acquiesce" in those estimates.

The mediation resulted in a settlement: the Clinic agreed to pay the Coons $2 million in exchange for their agreement to fully release the Clinic from any claims. According to the parties' appellate briefing, $2 million was less than the Clinic's insurance policy limits.

Group Health's insurance contract provided it with "Subrogation and Reimbursement Rights" if the Coons received funds from another source:

If GHO [Group Health Options, Inc.] provides benefits under this Agreement for the treatment of the injury or illness, GHO will be

subrogated to any rights that the Member may have to recover compensation or damages related to the injury or illness and the Member shall reimburse GHO for all benefits provided, from any amounts the Member received or is entitled to receive from any source on account of such injury or illness, whether by suit, settlement, or otherwise. This section VII.B more fully describes GHO's subrogation and reimbursement rights.

A later paragraph in the same section contained the fuller description of these rights, and it made Group Health's right of subrogation conditional upon the injury being "caused by a third party":

If the Injured Person's injuries were caused by a third party giving rise to a claim of legal liability against the third party and/or payment by the third party to the Injured Person and/or a settlement between the third party and the Injured Person, GHO shall have the right to recover GHO's Medical Expenses from any source available to the Injured Person as a result of the events causing the injury, including but not limited to funds available through applicable third party liability coverage and uninsured/underinsured motorist coverage. This right is commonly referred to as "subrogation." GHO shall be subrogated to and may enforce all rights of the Injured Person to the full extent of GHO's Medical Expenses.

And the next contract paragraph limited Group Health's rights: "GHO's subrogation and reimbursement rights shall be limited to the excess of the amount required to fully compensate the Injured Person for the loss sustained, including general damages."

Finally, the contract also prohibited the Coons from prejudicing Group Health's contract rights:

The Injured Person and his/her agents shall do nothing to prejudice GHO's subrogation and reimbursement rights. The Injured Person shall promptly notify GHO of any tentative settlement with a third party and shall

-6-

not settle a claim without protecting GHO's interest. If the Injured Person fails to cooperate fully with GHO in recovery of GHO's Medical Expenses, the Injured Person shall be responsible for directly reimbursing GHO for 100% of GHO's Medical Expenses.

On April 28, 2014, three days after the Clinic settlement, the Coons' lawyer first notified Group Health about it. He described the settlement amount as "woefully inadequate" but explained that "we felt that the chances of proving liability" were "very small":

> The claim against the Everett Clinic by Mr. and Mrs. Coon has settled for $2,000,000. This amount is woefully inadequate to cover the actual damages suffered by Mr. Coon, his wife, and their two children. Even without allocating a portion of the settlement to claims of Mrs. Coon and the children (who all were required by the Everett Clinic to release their claims as part of the settlement), Mr. Coon has not even come close to being "made whole" . . . .

> The reality is that we felt that the chances of proving liability on the part of the Everett Clinic for the fungal infection and its consequences were very small. The particular fungal organism is extremely rare and has been implicated in orthopedic surgeries on only a handful of occasions throughout the world. We consulted with nationally-known orthopedic and infectious disease experts and were unable to obtain expert medical support for a claim.

The letter concluded, "Under these circumstances, we are requesting that Group Health waive its subrogation claim."

Group Health did not respond. The Coons' lawyer sent a follow-up letter three weeks later, May 19, 2014. It said, "We have been holding back the lien amount in my firm's trust account. Please be advised that we will disburse the remaining settlement

funds on May 30, 2014." When no response was received by 4:00 p.m. on that date, the funds were disbursed.

By letters dated May 30 and June 3, counsel for Group Health declined to waive the company's interest in the settlement funds. The June 3 letter said, "If Nathaniel J Coon felt that he would not be fully compensated by the $2,000,000.00, he was under no obligation to accept it."

In a response letter dated June 9, 2014, the Coons' lawyer explained that his clients accepted $2 million because of proof problems, not because that amount fully compensated them:

> As you know from reading the mediation letters of both the claimant and defendant, *no one could determine how Mr. Coon ended up with a very rare fungal infection from his [knee] surgery, let alone whether anyone was negligent in allowing that to happen. We had consulted with a number of potential experts, and were unable to come up with a viable theory or with expert support for a claim of negligence.* Had we been able to do so, I would have strongly recommended that the Coons not settle for the amount ultimately offered, because it was far below any reasonable prediction of a jury verdict range.
>
> . . . .
>
> The settlement occurred before a lawsuit was filed. Mr. Coon had no option but to accept the very low settlement offer, given the fact a malpractice lawsuit could not be filed in the absence of a viable theory of liability and expert medical support for that theory. *As an attorney, I could not ethically file such a lawsuit, and unless discovery in the lawsuit produced different facts and evidence, a motion for summary judgment likely would have resulted in dismissal.*

(Emphasis added.) Counsel again requested that Group Health waive its stated subrogation lien.

The parties could not resolve the matter, and Group Health filed this lawsuit. Its amended complaint for declaratory relief requested a determination of Group Health's subrogation rights and judgment against the Coons for $372,634 plus interest and attorney fees.

Both parties moved for summary judgment. Group Health asserted there was no question that it held contractual subrogation rights under its policy with the Coons. Group Health pointed out that the Coons had collected "from the alleged tortfeasor" more than six times the amount of their medical expenses for a claim that had no viable threat of liability and no expert medical support. "To allow Defendant to retain the full proceeds of the settlement he received from the alleged tortfeasor, as well as the full amount that GHC expended on his behalf is the epitome of a double recovery." Group Health argued that it was entitled to summary judgment for the additional reason that the Coons breached their insurance contract when they failed to provide prompt notification of the settlement and failed to hold the settlement funds in trust pending determination of Group Health's subrogation and reimbursement rights. Group Health asserted, "Defendants accepted a settlement of a doubtful and disputed claim for less than policy limits. The Defendants are unable to show that the settlement did not fully

compensate them for the injury." Group Health sought an order "declaring that it has a valid and enforceable subrogation claim" and ordering the Coons to pay Group Health "the amount of its outstanding subrogation claim."

The Coons argued, in response, that they were not "made whole" by the settlement; thus, Group Health was not entitled to reimbursement because the "condition precedent" of full compensation had not occurred.[1] They attached declarations submitted by two medical malpractice lawyers (Todd Gardner and Kathy Cochran), opining that the settlement award did not amount to full compensation. The Coons' motion for summary judgment sought dismissal of all claims.

The court granted summary judgment to Group Health, concluding, "By settling for less than the available insurance policy limits in consideration of Defendants' evidence of damages versus risk of failure at trial, NATHANIAL COON and LORI COON's agreement to settle constitutes full compensation for their damages as a matter of law."

The Coons appeal from that decision. They have not appealed the separate order denying their motion for summary judgment.

---

[1] The Coons did not ask the trial court to reduce any reimbursement the trial court found that they owed Group Health by its proportionate share of attorney fees incurred to obtain the Clinic settlement. See Mahler v. Szucs, 135 Wn.2d 398, 429, 957 P.2d 632 (1998). However, we note that Group Health's June 3 letter offered to "participate in an equitable and proportionate share of attorney fees and costs."

No. 76365-2-I / 11

<u>ANALYSIS</u>

This court reviews a summary judgment order de novo, engaging in the same inquiry as the trial court.[2] We construe all facts and reasonable inferences from them in the light most favorable to the nonmoving party—here, the Coons.[3] Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[4]

The Coons' position on appeal is the same as below: Group Health is not entitled to reimbursement because the settlement did not result in full compensation. They claim the settlement covered only a portion of their general damages and none of their special damages.

The Coons rely exclusively on an insured party's right to full compensation that arises from the common law. They do not rely on the contract language limiting Group Health's rights "to the excess of the amount required to fully compensate the Injured Person for the loss sustained, including general damages." At oral argument, the Coons' counsel expressly disavowed any reliance on this provision. For this reason, we do not consider its effect on Group Health's claim.

---

[2] <u>Brown v. Snohomish County Physicians Corp.</u>, 120 Wn.2d 747, 752, 845 P.2d 334 (1993).
[3] <u>Loc Thien Truong v. Allstate Prop. & Cas. Ins. Co.</u>, 151 Wn. App. 195, 201, 211 P.3d 430 (2009).
[4] CR 56(c).

Group Health responds, first, that the appeal is moot because the Coons "materially breached" the insurance contract: "[a] party is barred from enforcing a contract that it has materially breached."[5] Group Health alleges that the Coons breached the contract by failing to provide adequate notice of the settlement, failing to protect Group Health's subrogation interests, refusing to provide reimbursement, and disbursing the funds counsel held in trust. When the trial court denied the Coons' summary judgment motion, it found as an undisputed fact that the Coons did not consult Group Health before settling their claim against the Everett Clinic.

Alternatively, Group Health contends that the common law "made whole" rule does not apply here because there is no third partly liable to the Coons, relying on Cook v. USAA Casualty Insurance Co.[6] Group Health appropriately does not defend the trial court's decision on the basis that the Clinic settlement made the Coons whole.[7]

Breach of Contract

When an insured breaches an insurance contract by failing to give the insurance company notice of a settlement, the law provides the company a remedy only if it can show prejudice.[8] Here, undisputed facts establish that the Coons breached the notice

---

[5] Rosen v. Ascentry Techs., Inc., 143 Wn. App. 364, 369, 177 P.3d 765 (2008).
[6] 121 Wn. App. 844, 847, 90 P.3d 1154 (2004).
[7] See Liberty Mut. Ins. Co. v. Tripp, 144 Wn.2d 1, 22, 25 P.3d 997 (2001) (no precedent for the position that settlement for less than the tortfeasor's policy limits raises a presumption of full compensation).
[8] Tripp, 144 Wn.2d at 16.

requirements of the contract. But Group Health has not established by undisputed facts any prejudice caused by this breach. Group Health merely makes a conclusory allegation that it was prejudiced by the release of the settlement funds from the Coons' attorney's trust account.

In view of Group Health's position that the Clinic had no liability to Coons, one could reasonably infer that the Coons' settlement did not impair any claim that Group Health might otherwise have pursued against the Clinic. Also, one can reasonably infer from Group Health's payment of Clinic charges that the Clinic had knowledge of at least an equitable reimbursement claim at the time of settlement. This may preclude the release signed by the Coons from extinguishing Group Health's direct claim against the Clinic.[9] Thus, the Coons can show at least a factual dispute about prejudice to Group Health. So we reject Group Health's claim that the Coons' breach makes this appeal moot.

## Applicability of the "Made Whole" Doctrine

Group Health relies exclusively on the provisions of its contract, and not any common law right of reimbursement, to support its claim. In Thiringer v. American Motors Insurance Co.,[10] the Washington Supreme Court adopted a "made whole" rule that limits this contractual right:

---

[9] Leader Nat'l Ins. Co. v. Torres, 113 Wn.2d 366, 373-74, 779 P.2d 722 (1989).
[10] 91 Wn.2d 215, 219, 588 P.2d 191 (1978).

The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tort-feasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss.

Group Health claims this rule does not apply in this case because there is no third party liable to the Coons, citing Cook. In Cook, this court affirmed the summary judgment dismissal of the Cooks' claims against its insurer, USAA. We held that the Thiringer "made whole" rule does not apply when the insured has no basis in contract or tort for a recovery from a third party.[11]

The reply brief of the Coons points out that Group Health is taking contradictory positions when it argues that the absence of a liable tortfeasor prevents the Coons from invoking the "made whole" principle of Thiringer. In oral argument before this court, the Coons described Group Health's argument as "a two-edged sword." They argued that if the absence of a liable tortfeasor prevents application of the "made whole" rule, then it also prevents Group Health from asserting a right of subrogation.

"Generally, subrogation allows the insurer to be substituted to the rights of the insured and pursue recovery directly *from the tortfeasor* or, when the insured recovers *from the tortfeasor*, to be reimbursed from that recovery."[12] Of the three elements our Supreme Court considers necessary for legal subrogation, the first is "'the existence of

---

[11] Cook, 121 Wn. App. at 849.

[12] Paulsen v. Dep't of Soc. & Health Servs., 78 Wn. App. 665, 668, 898 P.2d 353 (1995) (emphasis added).

-14-

a debt or obligation for which a party, other than the subrogee, is primarily liable.'"[13] The elements of legal subrogation set forth in Appleman's treatise include "existing and assignable claims held by the policyholder *against a tortfeasor*" and "justice requires that *the tortfeasor* pay for the loss."[14]

Group Health is bound by these principles of subrogation. There is no statutory lien (like the one considered in <u>Paulsen</u>) to displace them. The policy itself, in the paragraph that fully describes the insurer's subrogation rights, states that Group Health has a right to recover its medical expenses from any source available to the injured person "as a result of the events *causing the injury*." (Emphasis added.) Group Health consistently refers to its claim as a subrogation lien. Its claim for relief seeks a declaration that it has "a valid and enforceable subrogation claim." If Group Health cannot establish the existence of a negligent third party who caused its insured to incur medical expenses, this is not a subrogation case at all.

The Coons, the Clinic, and everyone else involved in this litigation have been unable to develop a viable theory of liability against any entity. If this were summary judgment in a malpractice lawsuit by the Coons against the Clinic or its doctors, the Coons would lose because they did not present evidence of negligence and causation.

---

[13] <u>Livingston v. Shelton</u>, 85 Wn.2d 615, 618-19, 537 P.2d 774 (1975) (quoting <u>Lawyers Title Ins. Co. v. Edmar Constr. Co.</u>, 294 A.2d 865, 869 (D.C. Ct. App. 1972)).

[14] 5 JEFFREY E. THOMAS & SUSAN LYONS, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 49.02[3][b] (2018) (emphasis added).

But this is summary judgment in a declaratory action brought by Group Health against the Coons to recover Group Health's alleged subrogation lien. Group Health has the burden of proving there is a valid subrogation lien. The summary judgment stage is past the point when speculation will suffice.[15] Because Group Health has not established that the Coons have a nonspeculative claim against a tortfeasor, it has no right to relief on summary judgment.

Both parties have briefed this appeal primarily on the assumption that this is a subrogation case. Group Health claims that under Cook, the absence of a liable tortfeasor means that the "made whole" rule does not apply. Assuming for the sake of argument that Group Health has the right to assert a subrogation claim even when no liable tortfeasor has been identified, we nevertheless conclude that Group Health is not entitled to relief on summary judgment. Group Health reads Cook too broadly.

Cook involved unusual facts.[16] The Cooks suffered losses caused by a house fire that started in a gas water heater flue during construction. They sued Lavine's, the company that installed the flue, and Butler, their house builder. They also separately sued their insurance company, USAA, over coverage for this loss. The Cooks and USAA settled. USAA paid the Cooks its policy limits and retained a subrogation interest in the Cooks' claims against Lavine's and Butler. The Cooks' claimed losses exceeded

---

[15] Marshall v. Bally's Pacwest, Inc., 94 Wn. App. 372, 377, 972 P.2d 475 (1999).
[16] Cook, 121 Wn. App. at 849.

the amount USAA paid them. So USAA retained separate counsel to appear and represent it against Lavine's and Butler.

Butler settled. The Cooks and USAA presented different versions of the settlement but agreed that USAA received $25,000 and Butler made its expert available to the Cooks for trial against Lavine's.

After the Cooks rejected Lavine's settlement offer, USAA settled with Lavine's by selling it USAA's subrogation interest. The Cooks agreed that this settlement did not affect its claims against Lavine's. The Cooks proceeded to trial against Lavine's and lost; a jury returned a defense verdict. Then the Cooks demanded that USAA "make them whole for their uninsured losses" by paying them a portion of the funds that USAA received from Lavine's and Butler. When USAA refused, the Cooks sued, claiming that under Thiringer, USAA was not entitled to retain any subrogation settlement funds until the Cooks were fully compensated.[17] The trial court properly dismissed the suit on summary judgment, and we affirmed because, in view of the defense verdict against Lavine's, "[s]ince the Cooks did not suffer compensable injury, they bear the risk of loss."[18]

Several aspects of this case distinguish it from Cook. First, in Cook, a court had decided that the entity paying money to USAA had no liability to the Cooks before the

---

[17] Cook, 121 Wn. App. at 847.
[18] Cook, 121 Wn. App. at 849.

Cooks demanded that USAA pay that money to them. USAA did nothing to interfere with the Cooks' pursuit of more money from Lavine's and Butler after they received from USAA the full amount available under its policy.

Here, no court had resolved the issue of the Clinic's liability to the Coons. For whatever reason, the Clinic was willing to pay the Coons $2 million to settle and avoid future litigation. The posture of the Coons, the Clinic, and Group Health is similar to that of an injured party, an alleged tortfeasor, and the injured party's insurance company in many personal injury settlements involving contested liability. In the absence of a judicial decision absolving the Clinic of liability, it is not clear that the weakness of the Coons' claims provides a basis for refusing to apply the Thiringer "made whole" rule. An insurance company that is pursuing its right of subrogation after settlement of a contested liability case should not be permitted to avoid application of the equities advanced by Thiringer merely by asserting that the alleged tortfeasor had no tort liability, especially when the absence of a liable tortfeasor suggests that the insurance company had no right of subrogation to begin with.

Second, the Cooks received the full benefit of their insurance policy, having received policy limits from USAA. Coons, by contrast, have not received policy limits. Refusing to apply Thiringer here would deprive the Coons of the full benefit of their

Group Health policy when a substantial fact question exists about the extent to which they have been fully compensated for their losses.

Third, the Cooks tried to use Thiringer as a sword to recover from USAA monies that a court already determined that they had no legal right to recover from Lavine's. The Cooks rejected a settlement offer from Lavine's and proceeded to trial. When this choice produced no recovery, the Cooks sought to benefit from USAA's more successful litigation strategy and transfer the economic consequences of their choice to USAA, relying on Thiringer, which based its "made whole" rule on equitable principles. The law has long recognized that "'he who seeks equity must do equity.'"[19] The Cooks did not. The Coons did not engage in any similar inequitable conduct.

For these reasons, Cook does not bar application of Thiringer in this case. The Coons have produced sufficient nonconclusory evidence to create a question of fact about whether their damages exceed the $2 million paid by the Clinic.

## CONCLUSION

The trial court incorrectly concluded that Group Health has a valid and enforceable subrogation claim against the Coons. Group Health has not established the existence of a third party tortfeasor who can be made to take responsibility for the Coons' damages. Even assuming the "made whole" principle applies in this situation, it

---

[19] Malo v. Anderson, 62 Wn.2d 813, 817, 384 P.2d 867 (1963) (quoting 2 JOHN NORTON POMEROY & SPENCER W. SYMONS, A TREATISE ON EQUITY JURISPRUDENCE § 385, at 52 (5th ed. 1941)).

cannot be said that the Coons' agreement to settle with the Clinic for less than its policy limits resulted in full compensation for their damages as a matter of law. Because no court had found the absence of Clinic liability to the Coons for their losses, our decision in Cook does not bar application of Thiringer in this case. Because questions of fact exist about whether the Coons have received full compensation for their losses and whether their breach of the Group Health contract prejudiced it, we reverse the trial court and remand for further proceedings consistent with this opinion.

Leach, J.

WE CONCUR:

Becker, J.